**JACQUELINE WADE-GREAUX, As Next of Kin and friend of TIANICOLE V. GREAUX, and JACQUELINE WADE-GREAUX, Individually, Plaintiff**

**v.**

**WHITEHALL LABORATORIES, INC., Defendant**

Civil No. 30/1988

District Court of the Virgin Islands

Div. of St. Thomas and St. John

March 1, 1994

206

207

## FINDINGS OF FACT AND
## CONCLUSIONS OF LAW

### INTRODUCTION

Plaintiff Jacqueline Wade-Greaux commenced this product liability action on her own behalf and on behalf of her daughter, TiaNicole Greaux, on January 21, 1988.

Plaintiff alleges that her use during pregnancy of Primatene® Tablets and Primatene® Mist, over-the-counter asthma medications sold by the defendant, Whitehall Laboratories, Inc. ("Whitehall"), caused TiaNicole to be born with true malformation of her upper limbs and other skeletal defects. She has asserted, on behalf of herself and her daughter, claims of strict liability, breach of warranty, negligence and misrepresentation. On October 21, 1991, this court granted Whitehall's motion for summary judgment against the claims asserted by the plaintiff's mother on her own behalf because they were barred by the applicable statute of limitations.[1]

---

[1] See Order dated October 21, 1991. A subsequent motion for interlocutory appeal was denied.

On August 6, 1992, Whitehall moved for summary judgment as to the remainder of plaintiff's claims on the grounds that plaintiff's experts' opinions were inadmissible at trial or insufficient as a matter of law on the issue of causation. Whitehall's motion was predicated upon the curricula vitae, written reports and deposition testimony obtained from plaintiff's five causation witnesses: Alan K. Done, M.D.; Enid F. Gilbert-Barness, M.D.; John A. Tilelli, M.D.; Stuart A. Newman, Ph.D.; and John D. Palmer, M.D., Ph.D. The motion was vigorously opposed by plaintiff. After consideration of competing paper submissions of experts' opinions, the court denied Whitehall's motion without prejudice[2] and scheduled a "Downing hearing"[3] to determine finally the admissibility and/or sufficiency of plaintiff's expert opinion evidence on causation. It was agreed that the plaintiff minor's case was totally dependent upon expert opinion.

Following the criteria set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S. Ct. 2786 (1993), DeLuca by DeLuca v. Merrell Dow Pharmaceuticals, Inc., 911 F.2d 941 (3d Cir. 1990), *on remand to* 791 F. Supp. 1042 (D.N.J. 1992), aff'd, 6 F.3d 778 (3d Cir. 1993), and Downing, this court conducted a hearing spanning seven separate days. Testimony was adduced from each of the plaintiff's expert witnesses listed above, with the exception of Dr. Palmer, whose deposition testimony was submitted by plaintiff because he was on a teaching sabbatical in New Zealand and could not attend.

Plaintiff's witnesses were required to address both general causation and specific causation. "General causation" concerns whether the agent at issue is capable of causing birth defects in humans at therapeutic dose levels, while "specific causation" concerns whether that agent caused the particular malformations found in this particular plaintiff. Plaintiff also offered testimony from Warren E. Cohen, M.D., a geneticist who offered no opinion as to either general or specific causation, but provided opinion testimony purporting to exclude genetic origins of TiaNicole's malformations, an opinion upon which plaintiff's causation witnesses relied. Plaintiff withdrew Alan K. Done, M.D. as an expert witness following defendants' cross-examination of the witness. However,

---

[2] See Order dated April 27, 1993.
[3] See United States v. Downing, 753 F.2d 1224 (3d Cir. 1985).

the court refused to exclude the testimony already received from him.

Testimony was also received from four expert witnesses offered by Whitehall: Lewis B. Holmes, M.D., Ellice S. Lieberman, M.D.; Mildred S. Christian, Ph.D.; and Paul A. Greenberger, M.D. The testimony addressed the subjects of teratology, epidemiology, mammalian experimentation, fetal development, genetics, and asthma and its treatment.

## FINDINGS OF FACT

### I. Incidence and Causes of Birth Defects

1. TiaNicole Greaux has malformed upper limbs. Each of plaintiff's expert witnesses has reviewed TiaNicole's medical records, including X-rays, and some have performed physical examinations of her. Plaintiff's experts have attempted to exclude certain possible causes of the malformations. Having done so to their own satisfaction, they have assigned causation to defendant's products because the drugs in question were allegedly ingested during a critical period of gestation.

2. Defendants, on the other hand, argue that not only have all other possible causes not been excluded but plaintiff's theory of general causation is speculative and inadmissible. Birth defects have existed throughout human history. Palmer Dep. (6/12/92) at 14. Limb deformities, in particular, are as old as recorded history. Cohen Test., Tr. 11/10/93 at 28–29.

3. Roughly 3% of all children born in the United States are born with malformations. Done Test., Tr. 11/16/93 (Mid-Morning) at 32. Data, collected by the Centers for Disease Control in Atlanta, Georgia, show that 1.5 of every 10,000 children born in the United States has a deformity of the upper limbs. Def. Ex. M; Cohen Test., Tr. 11/10/93 at 27–28.

4. Birth defects can be caused by a variety of factors, including genetic and chromosomal abnormalities and environmental agents. Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 22; Done Test., Tr. 11/16/93 (Mid-Morning) at 32. Environmental agents may include bacterial or viral infections, chemicals, radiation and drugs, and may account for between 10% and 20% of human malformations. Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 22, 27; see Palmer Dep. (6/12/92) at 15. The majority of birth defects, as many as 65%,

211

are of unknown origin. Cohen Test., Tr. 11/10/93 at 25; Done Test., Tr. 11/16/93 (Mid-Morning) at 32; Palmer Dep. (6/12/92) at 14–15.

5. Family history is not dispositive in assessing whether a birth defect has a genetic etiology. There can, for example, be a spontaneous mutation of genes in a child. Cohen Test., Tr. 11/10/93 at 21, 32. Alternatively, a child may suffer from a recessive genetic disorder, in which case each parent passes on a defective gene although neither parent is affected. Holmes Test., Tr. 11/16/93 (Late Afternoon) at 10–12.[4]

## II. Drugs at Issue

6. Primatene® Mist is an over-the-counter asthma medication that is distributed in a metered-dose inhaler that delivers 0.2 milligrams ("mg") of epinephrine with each administration. Greenberger Test., Tr. 11/19/93 (Vol. I) at 22–23.[5] Of that amount, only about 10%, or 20 micrograms, of epinephrine gets to the bronchial tubes, with the other 90% being metabolized and deactivated by enzymes in the stomach. Greenberger Test., Tr. 11/19/93 (Vol. I) at 22–23. The 20 micrograms that go to the bronchial tubes are metabolized there. Greenberger Test., Tr. 11/19/93 (Vol. I) at 23. Only about 1 microgram, or .001 mg, of epinephrine gets to the bloodstream per administration of Primatene® Mist. Greenberger Test.,

---

[4] Lewis B. Holmes, M.D., a geneticist/teratologist who appeared on behalf of Whitehall, opined that TiaNicole Greaux's defects were the result of such a recessive genetic defect, Holmes Test., Tr. 11/16/93 (Late Afternoon) at 8–12. Although plaintiff's geneticist, Dr. Cohen, did not agree with Dr. Holmes, Dr. Cohen conceded that TiaNicole's limb deformity might possibly be of genetic origin. He testified that if he had to professionally advise her, as an adult, of her risk of giving birth to a child with a limb deformity, he would tell her the risk was somewhere between zero and fifty percent, although he felt personally that the chance was closer to zero. Cohen Test., Tr. 11/10/93 at 32–36.

[5] Dr. Greenberger is an expert in the field of asthma and pregnancy. He received his medical degree from Northwestern University. From 1976–78, he performed a fellowship at Northwestern in which he studied the safety during pregnancy of particular asthma medications. Greenberger Test., Tr. 11/19/93 (Vol. I) at 7, 11, 19–21. As an internist affiliated with Northwestern University Medical School and Hospital, Dr. Greenberger treats pregnant asthmatics and conducts clinical studies as to the safety during pregnancy of asthma medications. Greenberger Test., Tr. 11/19/93 (Vol. I) at 7, 11, 19–21. Dr. Greenberger testified as to the effects of asthma on the fetus, the clinical human data he has compiled regarding the drugs at issue and the pharmacokinetics of epinephrine and theophylline at therapeutic dosages.

212

Tr. 11/19/93 (Vol. I) at 23. In the bloodstream, that 1 microgram gets diluted in the entire blood volume. Greenberger Test., Tr. 11/19/93 (Vol. I) at 23.

7. Epinephrine, also known as adrenaline, is a substance produced endogenously by the adrenal glands. Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 18; Tilelli Test., Tr. 11/15/93 (Vol. II) at 67. There is no difference pharmacologically between endogenous and exogenous epinephrine, such that the same blood level of each should produce the same effects. Tilelli Test., Tr. 11/15/93 (Vol. II) at 68; Done Test., Tr. 11/16/93 (Mid-Morning) at 31.

8. Primatene® "P Formula" Tablets are an over-the-counter medication sold for the treatment of asthma; each tablet contains 130 mg of theophylline, 24 mg of ephedrine and 8 mg of phenobarbital.[6] Jacobs Aff. at ¶ 4.

9. Epinephrine and ephedrine are classified as sympathomimetic drugs. The sympathomimetic class of drugs includes, among others-pseudoephedrine, phenylpropanolamine, phenylephrine and isoproterenol. Theophylline is classified as a methylxanthine drug. The xanthine class includes caffeine and aminophylline.

## III. Causation

A. *Teratology*

10. The science dealing with the causes of birth defects and their prevention is called teratology. Holmes Test., Tr. 11/16/93 (Vol. II) at 9–15; Tilelli, Tr. 11/15/93 (Vol. II) at 22–23; Newman Test., Tr. 11/12/93 at 48–49. An agent that causes birth defects is known as a teratogen. See, e.g., Holmes Test., Tr. 11/16/93 (Vol. II) at 15.

11. Whitehall called Lewis B. Holmes, M.D., to testify about the science of teratology and the methodology employed by teratologists. Dr. Holmes is a well-recognized teratologist/geneticist. See Tilelli Test., Tr. 11/15/93 (Vol. II) at 23 (recognizing Dr. Holmes as an eminent teratologist); Newman Test., Tr. 11/12/93 at 14–15. He is a member and past-president of the Teratology Society, the professional organization of teratologists. Holmes Test., Tr. 11/16/93 (Vol. II) at 11–12. Dr. Holmes is on the faculty of Harvard Medical School and has been affiliated for 30 years with Massachusetts

---

[6] This formulation is virtually identical to that found in Tedral®, a product that is not at issue in this case but that was the subject of expert testimony at the hearing. Def. Ex. E; Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 38.

General Hospital, where he is Chief of the Embryology/Teratology Unit. Holmes Test., Tr. 11/16/93 (Vol. II) at 7–9.

12. Persons who study teratology may come from different medical or scientific disciplines, including pediatrics, obstetrics, embryology, epidemiology and genetics. Holmes Test., Tr. 11/16/93 (Vol. II) at 31–32. Nevertheless, physicians and scientists who study the causes of birth defects, regardless of their specific training and experience, comprise a single medical/scientific community and are known as teratologists. Holmes Test., Tr. 11/16/93 (Vol. II) at 14. The Teratology Society, founded in the early 1960's, has over 600 members. Holmes Test., Tr. 11/16/93 (Vol. II) at 11.

B. *The Methodology for Determining Human Teratogenicity or General Causation*

13. The community of teratologists has developed a methodology for determining whether an agent is a human teratogen. Holmes Test., Tr. 11/16/93 (Vol. II) at 14–26. While different teratologists may articulate their community's methodology differently, the methodology can be summarized as follows:

a. the exposure during pregnancy should be associated with an increased frequency of a distinctive pattern of birth defects, as shown through repeated, consistent epidemiological studies;

b. there should be an animal model that duplicates the defects resulting in the human from the exposure;

c. there should be a dose/response relationship between the exposure and the effect on the experimental fetus; and

d. the mechanism of teratogenicity of the agent should be understood and make biologic sense.

Def. Ex. ii; Holmes Test., Tr. 11/16/93 at 15–16, 25–26. See Def. Exs. A, B, D; see also Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 80 (noting that Robert L. Brent, M.D., the author of Def. Ex. ii, is "the king of teratology"); Done Test., Tr. 11/16/93 (Mid-Morning) at 17–18 (noting that James Wilson, whom Dr. Done cited as an authority in teratology, has espoused similar standards). See also Def. Ex. ff at 13 ("studies of teratogenesis in man will of necessity be of a clinical and epidemiological nature").

14. This methodology is generally accepted within the community of teratologists as that required to determine whether a sub-

stance is a human teratogen. Holmes Test., Tr. 11/16/93 at 16–17, 24–26. This methodology has been (i) published in books deemed authoritative within the community of teratologists, such as Dr. Thomas H. Shepard's Catalog of Teratogenic Agents, see Def. Ex. A; see also Tilelli Test., Tr. 11/15/93 (Vol II.) at 23 (recognizing Dr. Shepard's *Catalog* as a standard book in the field of teratology), (ii) published in authoritative peer-reviewed journals such as *Teratology*, see Def. Ex. ii, and (iii) taught in universities and medical schools around the country. See Holmes Test., Tr. 11/16/93 (Vol. II) at 26, 33–34; Def. Exs. B, D. Indeed, teratologists do not publish conclusions that a specific agent is a human teratogen unless they have data to satisfy each of the community's required criteria. Holmes Test., Tr. 11/16/93 (Vol. II) at 24.

15. Regardless of the particular articulation of the teratology community's methodology, positive human epidemiologic studies are always required to reach a conclusion as to whether a specific agent is teratogenic in humans. Holmes Test., Tr. 11/16/93 (Vol. II) at 17.

16. Each of plaintiff's causation experts, however, has asserted that, while positive human epidemiologic studies would certainly be helpful in reaching a conclusion, such studies were not necessary for them to reach such a conclusion. See, e.g., Gilbert Test., Tr. 11/9/93 (Morning) at 105; Tilelli Test., Tr. 11/15/93 (Vol. I) at 12–17; Palmer Dep. (6/12/92) at 16; Done Test., Tr. 11/16/93 (Mid-Morning) at 21.

17. Despite this testimony, to the extent any of those expert witnesses has engaged in out-of-court medical and scientific activities relating to teratology, they have subscribed to the teratology community's criteria, specifically requiring positive human epidemiologic studies to reach an opinion as to the teratogenicity of the agent being considered. See Gilbert Test., Tr. 11/9/93 (Afternoon) at 11; Def. Ex. E; Done Test., Tr. 11/16/93 (Mid-Morning) at 13–15, 18–20; Def. Exs. cc, dd.

### 1. *Epidemiology*

18. To determine whether exposures to a specific agent during pregnancy are associated with an increased frequency of birth defects, teratologists employ human epidemiological studies. Holmes Test., Tr. 11/16/93 (Vol. II) at 17–18; see Def. Exs. A, B, D. Epidemiology is the study of the distribution of disease in popula-

215

tions and the risk factors associated with particular diseases. Lieberman Test., Tr. 11/18/93 (Vol. I) at 6.[7] It is observational, as opposed to experimental, research, in that epidemiologists observe the differences between those who have had a particular exposure and those who have not. Lieberman Test., Tr. 11/18/93 (Vol. I) at 6–9, 21. A "case control" epidemiologic study tends to be retrospective, comparing persons that have experienced a particular outcome to other persons without that outcome and determining how many in each group were exposed to the risk factor being studied. Lieberman Test., Tr. 11/18/93 (Vol. I) at 6. In a "cohort" study, epidemiologists follow persons with a particular exposure in comparison to other persons not so exposed, and look prospectively to determine the outcome. Lieberman Test., Tr. 11/18/93 (Vol. I) at 8.

19. Epidemiologists use an analytic tool known as the "null hypothesis," which postulates that there is no association between a specific exposure and a particular outcome. Lieberman Test., Tr. 11/18/93 (Vol. I) at 9. The goal of an epidemiological study is to determine whether one can reject the null hypothesis and conclude that, in fact, there is an association between the exposure and the outcome. Lieberman Test., Tr. 11/18/93 (Vol. I) at 9.

20. Epidemiologists use a measure called the relative risk, or rate ratio, to compare the incidence of disease occurrence in exposed individuals to the incidence of disease occurrence in unexposed individuals. Lieberman Test., Tr. 11/18/93 (Vol. I) at 10–11.[8] A relative risk of "1.00," therefore, indicates that the disease occurs among the exposed population with the same frequency as the dis-

---

[7] Dr. Lieberman is a perinatal epidemiologist, whose work focuses upon adverse pregnancy outcomes. Lieberman Test., Tr. 11/18/93 (Vol. I) at 4. She received her medical degree from the University of Florida and received her master's degree in public health and her doctorate in public health and epidemiology from Harvard University. Lieberman Test., Tr. 11/18/9 (Vol. I) at 4–5. She is currently affiliated with Harvard Medical School, Harvard School of Public Health and Brigham and Women's Hospital. Lieberman Test., Tr. 11/18/93 (Vol. I) at 4–5. Dr. Lieberman testified about the science of epidemiology and the particular epidemiological studies cited by plaintiff's expert witnesses. She expressed no opinion about the causation issue in this case.

[8] In a case control study, epidemiologists might use a measure called an "odds ratio," where an odd is defined as the probability over "one minus the probability." Lieberman Test., Tr. 11/18/93 (Vol. I) at 29. The odds ratio is then comprised of the odds of someone in the case group being exposed over the odds of someone in the control group being exposed. Lieberman Test., Tr. 11/18/93 (Vol. I) at 29.

ease occurs among the unexposed population. See Lieberman Test., Tr. 11/18/93 (Vol. I) at 10–11. A relative risk of "2.00" means that the disease occurs among the exposed population with twice the frequency as the disease occurs among the unexposed population. See Lieberman Test., Tr. 11/18/93 (Vol. I) at 10–11. It means that there is a 50% chance that a particular case of the disease was associated with the exposure and a 50% chance that the disease was not associated with the exposure.

21. Epidemiologists use a statistical tool called the "p-value" to measure the probability that a particular relative risk is due to chance. Lieberman Test., Tr. 11/18/93 (Vol. I) at 10. The most common value used to establish significance and to say that an observed association is probably real is "p< .05," which means that the probability that the association observed is due to chance is less than 5%. Lieberman Test., Tr. 11/18/93 (Vol. I) at 10, 16.

22. A related method of evaluating significance is the confidence interval, which provides a range of values consistent with the data collected. Lieberman Test., Tr. 11/18/93 (Vol. I) at 11. Most common is the 95% confidence interval, which corresponds to the .05 p value. Lieberman Test., Tr. 11/18/93 (Vol. I) at 55. In a 95% confidence interval, there is a 95% probability that the true value of the relative risk lies within that interval. Lieberman Test., Tr. 11/18/93 (Vol. I) at 11. If the confidence interval contains the value of 1.00, then the results are not considered statistically significant. Lieberman Test., Tr. 11/18/93 (Vol. I) at 12–13, 17; Def. Ex. jj. If the lower bound of the confidence interval exceeds 1.00, then the results are considered statistically significant. Lieberman Test., Tr. 11/18/93 (Vol. I) at 13–14, 17; Def. Ex. jj.

23. A "positive" epidemiologic study is one that presents a statistically significant association between a particular exposure and an increased risk of experiencing a particular outcome. Lieberman Test., Tr. 11/18/93 (Vol. I) at 38.

24. Regardless of statistical significance, one can never exclude the possibility that a particular association occurred by chance. Even using a 95% confidence interval, there is a 5% likelihood that any association found is not a true association, but is rather a chance occurrence. Lieberman Test., Tr. 11/18/93 (Vol. I) at 10–12. Because of this fact, absent a large single study with an overwhelmingly high rate ratio, epidemiologists generally require several individual positive studies linking a specific exposure with a

217

particular outcome before they draw any conclusions as to an association. Lieberman Test., Tr. 11/18/93 (Vol. I) at 22, 54; see Def. Exs. A, B, D, ii (incorporating that criterion into the teratology methodology).

25. A "confounding factor" is an exposure to one agent that is temporally associated with exposures to other agents, such that they appear to be having the same effect. Lieberman Test., Tr. 11/18/93 (Vol. I) at 14. Thus, for example, because alcohol use is associated with smoking, both may appear to be associated with an increased risk of lung cancer. Lieberman Test., Tr. 11/18/93 (Vol. I) at 14. Epidemiologists use statistical techniques, such as subgroups, multivariate analysis or statistical regression, to eliminate the possible effects of confounding factors. Lieberman Test., Tr. 11/18/93 (Vol. I) at 15, 21.

26. Anecdotal reports of the claimed adverse experiences associated with drug use by individual humans (whether case reports published in medical or scientific journals, drug experience reports filed with manufacturers or regulatory authorities or claims for injuries asserted in a lawsuit) do not constitute epidemiologic data or studies and are not considered by teratologists in studying causation. Holmes Test., Tr. 11/16/93 (Late Afternoon) at 45; Lieberman Test., Tr. 11/18/93 (Vol. I) at 18, 48. Such reports record nothing more than a temporal association between an exposure and a particular occurrence. Lieberman Test., Tr. 11/18/93 (Vol. I) at 18. Because of individual confounding factors, one cannot draw causation conclusions from such anecdotal data. Holmes Test., Tr. 11/16/93 (Late Afternoon) at 45; Lieberman Test., Tr. 11/18/93 (Vol. I) at 18; Tilelli Test., Tr. 11/15/93 (Vol. II) at 50. Epidemiologists use their population studies to eliminate the chance associations and confounding factors, which inherently infect anecdotal reports, to determine whether a statistically significant positive association exists. Lieberman Test., Tr. 11/18/93 (Vol. I) at 15, 18; see Lieberman Test., Tr. 11/18/93 (Vol. I) at 29–30, 48; Tilelli Test., Tr. 11/15/93 (Vol. II) at 50–51.

27. Absent consistent, repeated human epidemiological studies showing a statistically significant increased risk of particular birth defects associated with exposure to a specific agent, the community of teratologists does not conclude that the agent is a human teratogen. Holmes Test., Tr. 11/16/93 (Vol. II) at 34; Def. Exs. A, B, D, ii.

218

28. While consistent, repeated positive epidemiological studies are a necessary component for a teratological conclusion, positive epidemiologic findings are, standing alone, insufficient to permit a conclusion that a particular agent is teratogenic because the scientific community also requires confirmatory evidence from experimental animal studies. See Holmes Test., Tr. 11/16/93 (Vol. II) at 22; Def. Exs. B, D, ii.

## 2. *In Vivo and In Vitro Animal Studies*

29. In vivo animal studies are those conducted in a living animal. In vitro animal studies are those employing animals cells in a controlled environment, such as a test tube or Petri dish.

30. Although animal studies play a role in teratological investigations, it is scientifically invalid to extrapolate observations in animal experiments directly to human beings to determine human teratogenicity. Christian Test., Tr. 11/18/93 (Vol. II) at 17;[9] see Def. Exs. A, B, D, ii. While there are approximately 2,000 agents that have been shown to be teratogenic in some animal species, there are only about 25–30 proven human teratogens. Done Test., Tr. 11/16/93 (Mid-Morning) at 42; Tilelli Test., Tr. 11/15/93 (Vol. II) at 60. Sugar and table salt have been shown to be teratogenic in some animal species, although they are not human teratogens. Palmer Dep. (6/12/92) at 128–131. The agents that are considered to be proven teratogens in humans were established as such by human data. Done Test., Tr. 11/16/93 (Mid-Morning) at 42–43. As Dr. Done testified, human data is the glue that holds together all other data. Id.

31. Expert witnesses for both the plaintiff and the defendant recognize the principle of "species specificity." See Christian Test., Tr. 11/18/93 (Vol. II) at 18; Tilelli Test., Tr. 11/15/93 (Vol. II) at 59–60; Done Test., Tr. 11/16/93 (Mid-Morning) at 38; Palmer Dep.

---

[9] Dr. Christian is an expert in teratological experiments, especially those involving rabbits and other mammals, having performed several hundred such studies. Christian Test., Tr. 11/18/93 (Vol. II) at 9–10. She has been a member of the Teratology Society since 1973 and served as President of the Society in 1988–89. Id. She received bachelor's and master's degrees in zoology from Pennsylvania State University, and received her doctorate in anatomy, with a minor in pharmacology, from Thomas Jefferson University. She is the founder, Chairman and Executive Director of Research for Argus Research Laboratories, an independent laboratory that performs reproductive and developmental toxicology evaluations. Id.

219

(6/12/92) at 126; Newman Test., Tr. 11/12/93 at 66; Gilbert Test., Tr. 11/9/93 (Morning) at 45, 47. Species specificity refers to the fact that different mammalian species present different physiological, biochemical and metabolic systems. Christian Test., Tr. 11/18/93 (Vol. II) at 18. Similarly, mammals differ from non-mammalian species in at least these same respects. Christian Test., Tr. 11/18/93 (Vol. II) at 16–18. Because of these differences, different species have varying sensitivities to drugs and chemical agents. Christian Test., Tr. 11/18/93 (Vol. II) at 18; Tilelli Test., Tr. 11/15/93 (Vol. II) at 59–60; Palmer Dep. (6/12/92) at 126; Newman Test., Tr. 11/12/93 at 68; see Gilbert Test., Tr. 11/9/93 (Morning) at 45, 47. Different strains within the same species have different sensitivities to a particular agent. Christian Test., Tr. 11/18/93 (Vol. II) at 18. Thus, some drugs are teratogenic in some species and not teratogenic in others. Tilelli Test., Tr. 11/15/93 (Vol. II) at 59. Because of this recognized biological fact, if animal data shows that an agent is teratogenic in one species, one cannot conclude based on that data alone that the agent will be teratogenic in another species. Tilelli Test., Tr. 11/15/93 (Vol. II) at 59; see Gilbert Test., Tr. 11/9/93 (Morning) at 45, 47; Done Test., Tr. 11/16/93 (Mid-Morning) at 41; Palmer Dep. (6/12/92) at 126–128; Christian Test., Tr. 11/18/93 (Vol. II) at 18.

32. Because of the differences among species, there is recognized within the teratology community a hierarchy of in vivo animal studies. Newman Test., Tr. 11/12/93 at 126. Mammalian studies are accorded more weight than are non-mammalian studies, and within mammalian species, primate studies are given greater weight than any other. Newman Test., Tr. 11/12/93 at 126–127; Tilelli Test., Tr. 11/15/93 (Vol. I) at 16. In vitro studies, which are not conducted in living organisms, are given less weight than in vivo studies. See Christian Test., Tr. 11/18/93 (Vol. II) at 17; Done Test., Tr. 11/16/93 (Mid-Morning) at 37.

33. In addition to species specificity, the results of animal studies cannot be extrapolated to humans because such studies often employ quantities of the agent far in excess of the equivalent human therapeutic dose. Holmes Test., Tr. 11/16/93 (Vol. II) at 29; Done Test., Tr. 11/16/93 (Mid-Morning) at 38–40. A principle of teratology, known as Karnofsky's law or "sledgehammer teratology," recognizes that at some dosage level, virtually any substance, even sugar or salt, can cause malformations. Holmes Test., Tr. 11/16/93

(Vol. II) at 29–30; see Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 22; Palmer Dep. (6/12/92) at 128–131. High dosage animal studies cannot be relied upon to determine whether a substance is teratogenic in humans in therapeutic doses. Holmes Test., Tr. 11/16/93 (Vol. II) at 29; see Done Test., Tr. 11/16/93 (Mid-Morning) at 41.

34. The route of administration of an agent, which affects potential teratogenic result, is often different in experimental animal studies from the route employed by humans. Done Test., Tr. 11/16/93 (Mid-Morning) at 39; Tilelli Test., Tr. 11/15/93 (Vol. II) at 60–62; Holmes Test., Tr. 11/16/93 (Late Afternoon) at 21–22. While humans may ingest an agent, animal studies investigating use of that same agent may involve injections subcutaneously, intramuscularly, intravenously or sometimes directly into the uterine cavity. Done Test., Tr. 11/16/93 (Mid-Morning) at 39; Tilelli Test., Tr. 11/15/93 (Vol. II) at 60–61; see Holmes Test., Tr. 11/16/93 (Late Afternoon) at 21–22. Indeed, the stress caused by the means of administration in the experimental animal may itself cause the defects observed in the fetus. Done Test., Tr. 11/16/93 (Mid-Morning) at 39–40; Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 20.

35. One particular reason why the route of administration affects teratogenic potential relates to maternal metabolism. Metabolism is the process by which the body uses enzymes to alter the chemical composition of a foreign substance. The products of metabolism are called metabolites. Tilelli Test., Tr. 11/15/93 (Vol. II) at 61; Palmer Dep. (6/12/92) at 81.

36. Although maternal metabolism in the human may affect any teratogenic potential of an agent,[10] animal studies that involve direct application of the agent to the embryo or fetus do not account for maternal metabolism. For example, some in vivo tests inject the agent directly into the uterine cavity and some in vitro tests involve dripping the agent directly onto the embryonic system or placing cells in a solution containing the agent. Done Test., Tr. 11/16/93 (Mid-Morning) at 39; Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 108–09; Newman Test., Tr. 11/12/93 at 113. In such tests, the

---

[10] Although each of the ingredients of Primatene® Tablets and Mist—theophylline, ephedrine, phenobarbital and epinephrine—is metabolized by the human body, none of plaintiff's expert witnesses has an opinion as to whether the metabolites of those ingredients are teratogenic. See Tilelli Test., Tr. 11/15/93 (Vol. II) at 61–64; Palmer Dep. (6/12/92) at 81–84.

agent is never subjected to the metabolism of the maternal animal system and is never eliminated from the biologic system. Tilelli Test., Tr. 11/15/93 (Vol. II) at 61–62; Palmer Dep. (6/12/92) at 85–86. Such tests provide little, if any, understanding of the human exposure.

37. Animal studies, appropriately conducted, can be helpful in determining human teratogenicity. Animal studies provide information regarding the pattern of response and possible biologic mechanisms that may help explain how malformations detected in human beings develop. Christian Test., Tr. 11/18/93 (Vol. II) at 17–18. Once a potential teratogenic effect in humans is identified by positive epidemiologic studies, a mechanistic study in an animal model can help determine whether that observed effect is biologically plausibile. Christian Test., Tr. 11/18/93 (Vol. II) at 14.

38. A dose/response relationship refers to the fact that an increase in the dosage of a teratogenic agent should lead to an increase in both the number and severity of malformations. Holmes Test., Tr. 11/16/93 (Vol. II) at 21; Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 115–118, (Afternoon) at 126. Animal studies also are used to determine whether there is a dose/response relationship that will help to establish a teratogenic effect.

## IV. Methodologies and Data Used By Plaintiff's Expert Witnesses to Opine on General Causation

39. Plaintiff offered five witnesses to express opinions regarding the teratogenicity of Primatene® Tablets and Mist in humans at therapeutic doses. As discussed separately below, each witness described his or her credentials and experience, the methodology followed, the data considered and the ultimate opinions he or she derived therefrom.

40. Plaintiff's expert witnesses each opined that sympathomimetics and methylxanthines, active ingredients of Primatene® Tablets and Mist, are potentially teratogenic in humans. E.g., Gilbert-Barness Test, Tr. 11/9/93 (Morning at 64, 82). None of plaintiff's experts, however, offered a non-speculative basis for concluding that the Primatene® products are teratogenic in humans in therapeutic doses.

A. *Enid F. Gilbert-Barness, M.D.*

41. Dr. Gilbert is a respected pediatric pathologist, developmental pathologist and genetic pathologist and she describes herself as

222

a teratologist. Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 13, 16.

### 1. *Dr. Gilbert's Methodology*

42. Dr. Gilbert testified that she does not believe that repeated, consistent epidemiologic studies showing a statistically significant increased risk of malformations associated with the use of a medication are required to reach a scientifically valid conclusion as to whether that medication can cause malformations in humans at therapeutic dosage. Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 104–105. This is contrary to the methodology generally accepted in the teratology community and published in the authoritative teratological literature.

43. Dr. Gilbert subscribes to the view that no drug is 100 percent safe during pregnancy and would advise any pregnant woman to refrain from taking any drug that is not essential to her health. Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 89. Dr. Gilbert's prophylactic philosophy is that any compound that manifests a developmental defect in an animal species must have a potential for injury in humans. Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 63; Tr. 11/9/93 (Morning) at 45–47. Dr. Gilbert believes if one gets a significant positive result in a chick embryo, that while you could not extrapolate directly to a human, that positive result should cause a reasonable person to become suspicious about what could happen in human bodies by the ingestion of that drug. Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 47, 67. This approach is a prospective, predictive risk/benefit analysis that is irrelevant to an after-the-fact approach to determining causation-in-fact.

44. Although Dr. Gilbert disavows in the courtroom the methodology generally accepted by the scientific community, she has published articles to the scientific community regarding the potential teratogenic impact of agents in humans in which she has recognized and adopted that methodology.

### 2. *Dr. Gilbert's Lack of Epidemiological Support*

45. Dr. Gilbert was unable to offer repeated, consistent epidemiologic studies in support of her opinion. Indeed, Dr. Gilbert pointed to only one epidemiologic study that she claimed supported her opinion: an article written by Martha Werler entitled First Trimester Maternal Medication Use in Relation to Gastroschisis, 45 Teratology 361 (1992) ("Werler"). Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 93; Def. Ex. C.

46. The Werler study found a statistically significant association between pseudoephedrine and gastroschisis. See Def. Ex. C. Pseudoephedrine is a sympathomimetic drug that is not found in Primatene® and gastroschisis is a defect of the abdominal wall that is not found in TiaNicole Greaux. See Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 96–97. The Werler study, however, also considered limb defects, which TiaNicole Greaux does have, and concluded that there was no statistically significant association between limb defects and the use of the sympathomimetic pseudoephedrine. Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 98; Def. Ex. C. Even with respect to the positive finding for gastroschisis, Werler cautioned that, because of significant confounding factors, additional questions needed to be "answered before drawing even tentative conclusions about the teratogenicity of vasoactive medications." Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 99; Def. Ex. C. Further, even as to gastroschisis, the report stated, "[o]ur findings were not examined according to the dose, frequency, duration or timing. We were not able to rule out whether an underlying illness, perhaps an influenza virus, could have accounted for the finding, or for the elevated risks for analgesic/antipyretic use. There may be confounding by other factors, such as cocaine use." Def. Exh. C, p. 367.[11] Given its stated limitations and cautions, no testifying expert's opinion could reasonably rely upon the Werler study to draw a conclusion that any of the ingredients of Primatene® Tablets or Mist do cause limb defects in humans at therapeutic doses. Lieberman Test., Tr. 11/18/93 (Vol. I) at 45.[12] To the extent Dr. Gilbert-Barness' opinion is premised upon the Werler study, it is inadmissible on the question of general causation.

### 3. *Dr. Gilbert's Chick Embryo Studies*

47. Dr. Gilbert has performed a number of chicken embryo studies during her career. Her particular interest in performing these studies has been to contribute to the understanding of cardiac development. Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 106–

---

[11] That there may have been an underlying causative maternal illness was further indicated by the fact that acetaminophen [which] is not thought to be vasoactive was associated with gastroschisis, thereby suggesting that the identified associations were illness related. Defendant's Exhibit C, Abstract, p. 361.

[12] Plaintiff's experts, Dr. Done, testified that pseudoephedrine is not teratogenic in humans. Done Test., Tr. 11/16/93 (Mid-Morning) at 48.

07. Nevertheless, she relies upon certain of those studies for opinions expressed in this case because she associates heart malformations with skeletal differentiations. Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 28–29, 93. While those studies may suggest to a scientist that a drug in humans may not be entirely safe under all circumstances, see Gilbert-Barness Test Tr., 11/9/93 (Morning), at 45, human risk precautionary interest does not translate into human causation evidence.

48. Dr. Gilbert conducts her chick embryo studies by taking a fertile egg weighing approximately two ounces, removing a small, rectangular section of the shell, while leaving the chorioallantoic membrane intact, and applying to the developing embryo the agent that is being studied. Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 108–09. Such chick embryo studies are an in vitro, not an in vivo, animal model, and do not replicate a mammalian, let alone a human, exposure. Christian Test., Tr. 11/18/93 (Vol. II) at 16; Done Test., Tr. 11/16/93 (Mid-Morning) at 37.

49. The chick model is disfavored in the teratology community because it does not replicate human exposure. See Def. Exs. B, D. While Dr. Gilbert disputes that the chick model is disfavored, she does not contend that it replicates human exposure. At least four things happen in the exposure of a human fetus that do not occur in the chick embryo model: (i) absorption of the agent by the mother, (ii) distribution of the agent throughout the maternal and fetal systems, (iii) metabolism of the agent by the maternal system and (iv) elimination of the agent by the mother and fetus, thereby limiting the duration of the exposure. Christian Test., Tr. 11/18/93 (Vol. II) at 16–17. In chick embryo studies, the agent is dropped directly onto the embryo and is not subjected to maternal metabolism, Christian Test., Tr. 11/18/93 (Vol. II) at 17; Tilelli Test., Tr. 11/15/93 (Vol. II) at 64; Palmer Dep. (6/12/92) at 85–86; Newman Test., Tr. 11/12/93 at 117, is not distributed throughout the maternal and embryonic systems, Christian Test., Tr. 11/18/93 (Vol. II) at 17; see Newman Test., Tr. 11/12/93 at 32, and is not eliminated from the embryonic system, resulting in constant exposure until birth. Christian Test., Tr. 11/18/93 (Vol. II) at 17; see Newman Test., Tr. 11/12/93 at 113, 118–119 (regarding prolonged exposure in Petri dish experiments).

50. The chick embryo model is also disfavored in the scientific community because it is so sensitive that virtually any exposure

225

will cause a malformation. Christian Test., Tr. 11/18/93 (Vol. II) at 16; see Def. Exs. B, D.

51. Dr. Gilbert cited two chicken embryo studies in support of her opinion: one relating to the administration of Tedral® to chick embryos[13] and another relating to the administration of certain sympathomimetics and methylxanthines to chick embryos.[14] Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 30–31. In the first study, theophylline levels of between 1.0 mg and 2.8 mg were administered to eggs weighing approximately 2 ounces, the equivalent of administering, at a minimum, between 7 and 18 tablets of Tedral® or Primatene®[15] to a 110 pound woman. See Def. Ex. F; Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 34. In the second study, between 2.5 mg and 5.0 mg of theophylline were applied, the equivalent of administering, at a minimum, between 17 and 33 tablets of Tedral® or Primatene® to a 110 pound woman. See Def. Ex. F1. The maximum recommended dose of Primatene® tablets is 2 tablets.

52. The two chick studies cited by Dr. Gilbert are not helpful in determining effects in humans because of the principles of species specificity and "sledgehammer" teratology, and because the chick embryo model is so vastly different from the human experience. Dr. Gilbert testified that she could not estimate the degree to which she could extrapolate from those studies to the human experience "because every animal species varies in susceptibility." Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 45.

### 4. *Dr. Gilbert's Tedral® Case Report*

53. The second article cited by Dr. Gilbert was a case report written by her and others published under the title An Aborted Human Fetus with Truncus Arteriosus Communis—Possible Teratogenic Effect of Tedral®, 1 Heart and Vessels 176 (1985). Gilbert-Barness

---

[13] See Def. Ex. F: R. Matsuoka, E.F. Gilbert, et al., Experimentally Induced Cardiovascular Malformations in the Chick Embryo, Part II. Teratogenic Effect of Tedral® (Theophylline, Ephedrine, and Phenobarbital) on Cardiac Development in Chick Embryos," 23 Birth Defects 449 (1987).

[14] See Def. Ex. F1: Harold J. Bruyere, Jr., E.F. Gilbert, et al., External Malformations in Chick Embryos Following Concomitant Administration of Methylxanthines and B-Adrenomimetic Agents: I. Gross Pathologic Features, 28 Teratology 257 (1983).

[15] Primatene® P Formula has a formulation identical to that found in Tedral®.

226

Test., Tr. 11/9/93 (Morning) at 31; Tr. 11/9/93 (Afternoon) at 4–12; see Def. Ex. E.

54. The Tedral® case report concerns a woman who aborted a malformed fetus after being treated with several medications during an emergency hospitalization for an overdose of Tedral®. Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 31; Tr. 11/9/93 (Afternoon) at 7; see Def. Ex. E. In her case report, Dr. Gilbert notes that Tedral® had never previously been implicated as a human teratogen, and discloses that there were a number of environmental factors confounding any association. Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 7–9; see Def. Ex. E. For example, during her pregnancy, the woman in the report (i) had smoked one to three packs of cigarettes per day, (ii) had suffered with an upper respiratory infection, (iii) had a familial history of alcoholism and, (iv) most significantly, when being treated for the Tedral® overdose, was given other medications, including Ativan, Valium, aspirin and Corgard. See Def. Ex. E. Another of plaintiff's expert witnesses, John A. Tilelli, M.D., testified that Corgard is vasoactive and that Ativan and Valium have had embryopathies reported in association with their use. Tilelli Test., Tr. 11/15/93 (Vol. II) at 57–58.

55. When asked whether she believed that Tedral® caused the malformations reported in her article, Dr. Gilbert responded that it seemed to her that Tedral® and the malformations "may be related." Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 40. This is a speculative opinion that does not meet either a reasonable certainty or reasonable probability standard. As the published title of the case report reflects, Dr. Gilbert did not assert that Tedral® caused the observed malformations of the fetus, but concluded only that Tedral® was a *possible* cause. Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 6; see Def. Ex. E.

56. Dr. Gilbert concluded that case report by stating that "[f]urther human epidemiological studies and mammalian experimentation will be needed to confirm a teratogenic effect of Tedral® during early pregnancy." Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 11; see Def. Ex. E. This statement, published in a peer-reviewed scientific journal, is consistent with the methodology generally accepted by the community of teratologists (i.e., the need for human epidemiologic data disclosing a statistically significant

elevated risk), which methodology Dr. Gilbert sought to disavow in court.[16]

### 5. *Dr. Gilbert's Rabbit Study*

57. As noted, non-mammalian studies, such as those involving chick embryos, are accorded less weight by teratologists than are mammalian studies. Newman Test., Tr. 11/12/93 at 126–127; Tilelli Test., Tr. 11/15/93 (Vol. I) at 16. Dr. Gilbert acknowledged that one necessary component for reaching a conclusion as to the human teratogenicity of an agent is a mammalian animal model that demonstrates both a dose/response relationship and malformations at exposures comparable to the therapeutic dose in humans. Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 105, (Afternoon) at 69; see Def. Exs. B, D.

58. Dr. Gilbert cited in support of her opinion only one mammalian study: her own experimental study involving the administration of Primatene® Tablets and Mist to rabbits. Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 29–30. The court finds that this study is analytically invalid, inadmissible and fatal to any expert opinion dependent thereon.

### a. *Purpose Of The Study*

59. The rabbit study is an essential predicate for Dr. Gilbert's opinion. When she was first contacted by plaintiff's counsel, she had already performed numerous studies of the effects of sympathomimetics and methylxanthines on chick embryos and had written the Tedral® case report. At that time, Dr. Gilbert, advised plaintiff's counsel that she could not give him an opinion that Primatene® Tablets and Mist were teratogenic in humans at therapeutic dosage until she had performed a mammalian study that would support such an opinion. Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 66. Dr. Gilbert acknowledged at the hearing that she did not have an opinion as to causation in the absence of a positive study in mammals. Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 67.

---

[16] Dr. Gilbert also alluded to other product liability litigation in which she participated that involved sympathomimetics other than those in Primatene, as well as other classes of drugs. Gilbert Test., Tr. 11/9/93 (Morning) at 84. Dr. Gilbert testified that that case "raise[d] [her] suspicions that these drugs are potentially hazardous." Id.

60. Plaintiff's counsel paid for Dr. Gilbert's out-of-pocket costs related to the pilot study involving the administration of Primatene® Tablets and Mist to rabbits. Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 29; Tr. 11/9/93 (Afternoon) at 134.

b. *Rejection by Teratology*

61. Although the study was conceived by Dr. Gilbert, it was designed in part and performed by Barbara Spennetta, an animal resources coordinator at Promega Laboratories. Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 69–71. Once the study had been completed, Dr. Gilbert prepared a manuscript that she submitted to Teratology, the peer-reviewed journal of the Teratology Society. Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 120; Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 106–07. Teratology rejected the manuscript and returned it with criticisms. Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 120; Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 106–07.

62. Thereafter, Dr. Gilbert enlisted John A. Tilelli, M.D., another of plaintiff's expert witnesses, to rewrite her report of the study. Tilelli Test., Tr. 11/15/93 (Vol. II) at 70. Dr. Tilelli had never collaborated with Dr. Gilbert before and did not know her prior to his involvement with this case. Tilelli Test., Tr. 11/15/93 (Vol. II) at 72. Dr. Gilbert sent Dr. Tilelli two drafts of the manuscript of her study, but did not send him, and he did not see, any of the data underlying the rabbit study. Tilelli Test., Tr. 11/15/93 (Vol. II) at 72–73; see Def. Exs. T, U. Dr. Tilelli simply revised Dr. Gilbert's draft, added his own name as an author and, with Dr. Gilbert's approval, submitted the revised draft to a veterinary publication, Veterinary and Human Toxicology.

63. Dr. Gilbert did not report either in her manuscript to Teratology or in the later manuscript to Veterinary and Human Toxicology that plaintiff's counsel contributed to the costs of the study. Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 134. The authors intend to provide this information if they resubmit the manuscript.

64. Neither Dr. Gilbert nor Dr. Tilelli is an expert in the characteristics of rabbits, particularly the New Zealand white rabbit strain used in the study. Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 117–120; Dr. Tilelli Test., Tr. 11/15/93 (Afternoon) at 23.

c. *Qualifications of Those Involved in the Study*

65. While Dr. Gilbert had performed dozens of chick embryo studies, she had conducted only one previous rabbit study in her

229

career. Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 112; Tr. 11/9/93 (Afternoon) at 124. Ms. Spennetta, who actually conducted the test, was an animal husband technician who cared for animals at Promega Laboratories, a manufacturer of biological products. Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 70. Her only previous experience with a mammalian teratological study was her involvement in Dr. Gilbert's earlier rabbit study. Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 125. Dr. Tilelli, who revised the manuscript, is neither a teratologist nor a research scientist. This was the only teratology study in which he had ever been involved. Tilelli Test., Tr. 11/15/93 (Vol. I) at 6, 11; Tr. 11/15/93 (Vol. II) at 22.

d. *Scientific Invalidity of Conclusions*

66. The rabbit study, as rewritten by Dr. Tilelli and endorsed by Dr. Gilbert, concluded that administration of Primatene® (i) caused malformations in rabbits, (ii) had an adverse effect on fertility, (iii) increased the incidence of post-partum deaths and (iv) affected post-natal somatic growth. Def. Ex. X.

67. Plaintiff's experts demonstrated great confusion as to the number of rabbits used in the study. Since they are confused, a jury would be no less confused. Although the written report indicated that there were 21 rabbits, see Def. Ex. X, both Dr. Gilbert and Dr. Tilelli testified that they thought there were actually 13 rabbits. See Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 55, 113; Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 99; Tilelli Test., Tr. 11/15/93 (Vol. II) at 75, 78. These variations could affect substantially the statistical conclusions given the small number of rabbits used in the study by any measure. Christian Test., Tr. 11/18/93 (Vol. II) at 24–25. Ms. Spennetta's laboratory notebook for the test indicates that there were only 16 female rabbits used in the study. Christian Test., Tr. 11/18/93 (Vol. II) at 20; see Def. Ex. L. Moreover, these rabbits were spread over multiple dosage groups, so that most dosage groups had only one rabbit in them. Christian Test., Tr. 11/18/93 (Vol. II) at 21–24. Because too few animals were used in too many dosage groups, there is no scientifically valid basis for identifying causal relationships in the test. Christian Test., Tr. 11/18/93 (Vol. II) at 24–25. Aggregated results from all "high dose" and "low dose" groups made it appear as if there were only two dosage groups. This was a scientifically inappropriate procedure. Christian Test., Tr. 11/18/93 (Vol. II) at 22–23.

68. Dr. Gilbert contended that her rabbit study was a mere pilot study to see if malformations could be induced using defendant's products. Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 51, 71, 72. Even if it qualified as a pilot study, however, Dr. Gilbert admitted that scientists would consider the pilot test only to determine whether it suggested reasonable hypotheses that should be further tested to determine if the products in fact had a teratological impact in that animal model. Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 51, 72. Consequently, it would follow that it is inappropriate for Dr. Gilbert or any other scientist to rely upon this rabbit study to support an opinion offered in a court of law. Further, neither Dr. Gilbert nor Dr. Tilelli was familiar with the underlying data of the study which, when considered, undercuts conclusions in the written report regarding malformations.

69. While Dr. Tilelli's report of the study indicates that there were four pups born with "ventral, midline, chest and abdominal wall defects," see Def. Ex. X, the underlying data show only one fetus with that condition and only three with any kind of malformation. Christian Test., Tr. 11/18/93 (Vol. II) at 30–32. The abdominal wall defect described is known as thoracogastroschisis, a condition that occurs spontaneously in between 2–10% of the type of rabbits used in Dr. Gilbert's test. Christian Test., Tr. 11/18/93 (Vol. II) at 30–31; Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 117, 119. Because all malformations were found in low-dose groups and none in a high-dose group, the required dose/response relationship does not exist. Christian Test., Tr. 11/18/93 (Vol. II) at 31; Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 126, 127. This shows either that the test was invalidly constructed or that the drugs are not teratogenic in the rabbit.

70. The finding regarding the adverse effect on fertility is also invalid:

> *First,* Ms. Spennetta purchased "retired breeders" for the test. This indicates that the female rabbits used were past their prime period of fertility. Christian Test., Tr. 11/18/93 (Vol. II) at 33–34.

> *Second,* the fertility finding is compromised by the fact that the protocol's directions regarding the mating of male rabbits was not followed. Christian Test., Tr. 11/18/93 (Vol. II) at 33. Specifically, Ms. Spennetta did not give all of the male rabbits the required rest period for sperm recovery. Christian Test., Tr.

231

11/18/93 (Vol. II) at 27–28. At least two of the females who experienced breeding problems had been mated to a male that had not been given sufficient rest. Christian Test., Tr. 11/18/93 (Vol. II) at 28. Although Dr. Gilbert attributed such breeding problems to the administration of Primatene®, it is at least as likely, if not more likely, that the breeding problems were due to Ms. Spennetta's failure to give the males the required rest period. Dr. Gilbert testified that she had determined that Ms. Spennetta followed a written protocol. Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 53–54. However, the protocol was not followed.

*Third,* the fertility finding is compromised by the fact that breeding histories were unavailable for two of the rabbits that experienced breeding problems. Christian Test., Tr. 11/18/93 (Vol. II) at 35. The records for four of the 16 rabbits had been lost in the computer of the supplier providing the rabbits, and neither Dr. Gilbert nor Ms. Spennetta had ever seen those records. Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 64, 112. Dr. Gilbert first testified that she personally reviewed the histories of each of the rabbits before the test started. Gilbert-Barness Test. Tr. 11/9/93 (Morning) at 55–56. This was shown not to be true. As Dr. Gilbert herself acknowledged, the absence of the breeding histories by itself renders the study vulnerable within the scientific community. Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 115.

*Fourth,* New Zealand White rabbits have a fertility likelihood of 85% (i.e., 85% of the matings will result in pregnancy); the treated animals were compared to the 6 control animals, which experienced 100% fertility in this test. Christian Test., Tr. 11/18/93 (Vol. II) at 33.

*Fifth,* there were three rabbits in low dose groups that did not produce a litter, while there was only one rabbit in a high dose group that did not produce a litter, indicating once again the lack of a dose/response relationship. Christian Test., Tr. 11/18/93 (Vol. II) at 33.

71. In its fertility finding, the report also concluded that Primatene® may have caused early embryonic death. Def. Ex. X. This could have been confirmed either by performing a cesarean section on the mother or by searching for the blood expelled when early embryonic death occurs. Christian Test., Tr. 11/18/93 (Vol. II) at 36.

Because neither procedure was performed nor any blood observed, there is no basis for that conclusion. Christian Test., Tr. 11/18/93 (Vol. II) at 35–36).

72. The report's finding regarding post-partum death is false. Christian Test., Tr. 11/18/93 (Vol. II) at 37. The underlying data disclose that there was a control rabbit that had a litter of nine pups, all of which died postpartum. Christian Test., Tr. 11/18/93 (Vol. II) at 37. This litter and the nine pup deaths were then excluded from the study and replaced by a substituted "control" litter. Christian Test., Tr. 11/18/93 (Vol. II) at 37–38. Had the dead litter been included, it would have dramatically altered the relative incidence of postpartum death.

73. In addition, Ms. Spennetta cross-fostered some pups into other litters. Christian Test., Tr. 11/18/93 (Vol. II) at 38. Because mothers sometimes reject pups that are fostered into their litter, that may explain why the pups that were fostered died. Christian Test., Tr. 11/18/93 (Vol. II) at 38.

74. The report's findings regarding post-natal somatic growth are not scientifically valid.[17] Christian Test., Tr. 11/18/93 (Vol. II) at 39. It is impossible to attribute any claimed growth or limb/torso ratio differences in the pups to the administration of Primatene® because any differences in size and proportions are genetically affected, Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 133; see Christian Test., Tr. 11/18/93 (Vol. II) at 42, and neither Dr. Gilbert nor Ms. Spennetta measured the limbs or torsos of the parents of any of the pups. Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 130–31; Christian Test., Tr. 11/18/93 (Vol. II) at 42. Absent that measurement, no one can make a valid scientific finding with respect to limb/torso ratios. Christian Test., Tr. 11/18/93 (Vol. II) at 42. Christian Test., Tr. 11/18/93 (Vol. II) at 42. The following features of the test also render the conclusion invalid:

> *First,* the pups were not measured or weighed until they were 18 days old, so pups that died before that date were not included in any growth or proportion findings. Christian Test., Tr. 11/18/93 (Vol. II) at 39, 44.

---

[17] Ms. Spennetta's laboratory notebook indicates that the goal of Dr. Gilbert's study was to produce grossly shortened front and back legs in the rabbits. Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 102; Def. Ex. L. None of the pups, however, was born with malformed limbs. Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 129. The test failed in its primary purpose.

*Second,* the size and weight of individual pups is dependent upon the number of pups in the litter and yet this factor was nowhere considered in the analysis. Christian Test., Tr. 11/18/93 (Vol. II) at 40.

*Third,* there was no dose/response relationship observed. Christian Test., Tr. 11/18/93 (Vol. II) at 41.

75. The design of Dr. Gilbert's rabbit study was not the type that could have produced scientifically valid data upon which a scientist in the field of teratology could reasonably rely to draw conclusions as to the teratogenicity of Primatene® Tablets or Mist in rabbits, let alone in humans at therapeutic doses. Christian Test., Tr. 11/18/93 (Vol. II) at 44. Moreover, the procedures employed in the study were not the kind that could have produced results upon which the scientific community could reasonably rely. Christian Test., Tr. 11/18/93 (Vol. II) at 44. Finally, none of the reports of the study, especially the one rewritten by Dr. Tilelli, accurately reports the data underlying the study. Christian Test., Tr. 11/18/93 (Vol. II) at 49.

76. Because Dr. Gilbert's general causation opinion rests upon that study, it is inadmissible.

### 6. *Dr. Gilbert's Letter to the Editor of Teratology*

77. Dr. Gilbert's opinion regarding the human teratogenic potential of the ingredients of Primatene®, at least as she disclosed it to the scientific community, was, and remains, that they *may* cause malformations, not that they *do* cause malformations. See Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 40; Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 6; see Def. Ex. E. What she means by reasonable degree of medical certainty as to causation is that some effect in humans is possible. Id. at 64. She opined only as to her suspicions that the drug ingredients in question are potentially hazardous in therapeutic dosages. Id. at 84.

78. Within the last 12 months, after having conducted numerous chick embryo studies involving sympathomimetic agents, having reported the Tedral® overdose in a woman and having conducted her study on the administration of Primatene® to rabbits, Dr. Gilbert wrote a letter to Dr. Robert L. Brent, the editor of Teratology. Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 13. In that letter, she expressed her opinion "that sympathomimetic drugs *may be* teratogenic in humans." Def. Exs. G, H (emphasis added); Gilbert-

234

Barness Test., Tr. 11/9/93 (Afternoon) at 14. Thus, the opinion that she is prepared to share with the scientific community is that there is a mere *possibility* of human teratogenicity. She has not offered a qualitatively different opinion to this court.

## B. *Stuart A. Newman, Ph.D.*

79. Dr. Newman is a professor of cellular biology and anatomy at New York Medical College. Newman Test., Tr. 11/12/93 at 4. His areas of specialization are developmental biology, cell biology, molecular biology, biochemistry and molecular genetics. Newman Test., Tr. 11/12/93 at 15. He is a highly regarded bench scientist who works exclusively with in vitro research. Newman Test., Tr. 11/12/93 at 57. He is not a physician and does not work with humans or human data. Newman Test., Tr. 11/12/93 at 102, 110.

### 1. *Dr. Newman's Qualifications and Methodology*

80. Dr. Newman's focus as a scientist is in the area of biological mechanisms, i.e., how something *might* occur during embryonic development. Newman Test., Tr. 11/12/93 at 48, 50, 122, 130. His work pertains to controlled in vitro experiments using chick embryo cells, which studies permit him to examine proposed mechanisms of cellular development. Newman Test., Tr. 11/12/93 at 19, 36.

81. Dr. Newman's work is directed towards satisfying one criterion of the teratology community's methodology for determining human teratogenicity—plausible biologic mechanisms, Newman Test., Tr. 11/12/93 at 130, but satisfaction of that one criterion alone is an insufficient basis to establish human teratogenicity. See Exs. A, B, D, ii. Biologically reasonable hypotheses developed from in vivo or in vitro animal studies do not necessarily occur in actual human fetal development. See Tilelli Test., Tr. 11/15/93 (Vol. I) at 25. Dr. Newman diverges from the community's methodology by making precisely that speculative leap. Dr. Newman testified that, in assessing human teratogenicity, he considers only whether the agent has caused similar defects in the cells of another vertebrate system. Newman Test., Tr. 11/12/93 at 36–37.

82. Dr. Newman does not consider human data, and testified that he finds it confusing. Newman Test., Tr. 11/12/93 at 110. Dr. Newman's approach for assessing general causation inappropriately amounts to a direct extrapolation from in vitro animal cell data to humans. Because it improperly fails to consider species

235

specificity, metabolism, duration of exposure and other factors that affect teratogenicity in mammals, including humans, Newman Test., Tr. 11/12/93 at 66, it is not helpful and cannot be admitted.

## 2. *Dr. Newman's Opinions and Data Regarding Mechanisms*

83. Dr. Newman postulated two possible biological mechanisms: (i) that sympathomimetics and methylxanthines elevate cyclic AMP, thereby causing precocious and abnormal limb cell differentiation, Newman Test., Tr. 11/12/93 at 22–25, 42, and (ii) that sympathomimetics are vasoconstrictive, causing cellular disruption either through hemorrhage or insufficient blood supply, Newman Test., Tr. 11/12/93 at 43–44.

84. Regarding the first potential mechanism, Dr. Newman is of the opinion that sympathomimetics such as ephedrine raise cyclic AMP and that methylxanthines, like theophylline, inhibit the natural breakdown of cyclic AMP. Newman Test., Tr. 11/12/93 at 22–23, 39–43. He is also of the opinion that, when cyclic AMP is elevated, chick limbs, and therefore human limbs, develop in a precocious and abnormal fashion. Newman Test., Tr. 11/12/93 at 22–23. In support of this opinion, Dr. Newman relies principally upon three data: (i) an article by Robert A. Kosher and Mary P. Savage entitled Studies on the Possible Role of Cyclic AMP in Limb Morphogenesis and Differentiation, 56 J. Embryol. Exp. Morph. 91 (1980); (ii) his own in vitro work and (iii) Dr. Gilbert's chick embryo study relating to external malformations. Newman Test., Tr. 11/12/93 at 24–25, 56–57; Def. Exs. F1, Q.

85. Dr. Newman considers Kosher's study, published in 1980, to be seminal. Newman Test., Tr. 11/12/93 at 88; Def. Ex. Q. In that study, Dr. Kosher applied dibutyryl cyclic AMP to a particular piece of limb tissue from a single chick limb. Newman Test., Tr. 11/12/93 at 62, 89. Based upon this study, Dr. Kosher proposed as a testable model the role of cyclic AMP in limb morphogenesis. Newman Test., Tr. 11/12/93 at 92.

86. Using the Kosher model, Dr. Newman engages in in vitro studies by immersing chick cells in a solution containing dibutyryl cyclic AMP as well as a xanthine (such as theophylline). Newman Test., Tr. 11/12/93 at 60, 93. From this work, Dr. Newman states that he can demonstrate that excessive levels of cyclic AMP cause precocious cell differentiation in chicks and that the presence of a xanthine precludes the chick cells' natural ability to reduce the ele-

vated levels of cyclic AMP. Unlike Kosher, however, Dr. Newman places approximately 250,000 chick cartilage cells from 30–40 different embryos into Petri dishes. Newman Test., Tr. 11/12/93 at 60–62. Although Kosher proposed that the apical ectodermal ridge is an important component of the limb differentiation process, Dr. Newman's studies typically do not have the ridge cells present. Newman Test., Tr. 11/12/93 at 44–45, 62–63, 65. Dr. Newman acknowledges that this ridge is important but does not know what effect there would be if the ridge were kept in place in the dibutyryl cyclic AMP experiments.

87. Dr. Newman concedes that the exposure to the foreign agent in these in vitro chick cell studies is different from the exposure to the agent in a mammal. Newman Test., Tr. 11/12/93 at 113, 117, 119. As with the in vitro chick embryo model, Dr. Newman's in vitro chick cell model does not involve (i) distribution of the agent throughout maternal and fetal systems, (ii) metabolism by a maternal system, (iii) elimination of the agent or (iv) limited exposure to the agent. Christian Test., Tr. 11/18/93 (Vol. II) at 17.

88. Dr. Gilbert's chick embryo study "is the major component of [Dr. Newman's] understanding of what [sympathomimetics and methylxanthines] do in developing limb systems." Newman Test., Tr. 11/12/93 at 25. Dr. Newman believes that upper and lower limbs may have different susceptibilities to teratogenic agents. Newman Test., Tr. 11/12/93 at 66–67, 95. Dr. Gilbert's study, however, found very few upper limb defects, Newman Test., Tr. 11/12/93 at 96–101; see Def. Exs. R, S.

89. Neither Kosher's, nor Newman's nor Gilbert's studies used human cells and only the Gilbert study used sympathomimetics. Newman Test., Tr. 11/12/93 at 60, 112. Nevertheless, Dr. Newman is of the belief that anything that raises cyclic AMP is potentially a teratogenic agent, including naturally-occurring events that raise endogenous sympathomimetics in the body. Newman Test., Tr. 11/12/93 at 76–83. Based solely upon in vitro chick data, Dr. Newman holds the belief that a pregnant woman's consumption of coffee (a xanthine) on a particularly stressful day (leading to elevated endogenous epinephrine) could potentially be a teratogenic event for her fetus. Newman Test., Tr. 11/12/93 at 101–102.

90. One of plaintiff's own witnesses, Dr. Done, contradicts Dr. Newman by opining that not all sympathomimetics are teratogenic in humans because some act through different mechanisms. Done

Test., Tr. 11/16/93 (Mid-Morning) at 28, 36, 48. Other teratologists believe that there is no association between a rise in cyclic AMP and birth defects because of absence of proof of human studies that that occurs. Holmes Test., Tr. 11/16/93 (Late Afternoon) at 37–39. None of the drugs known to cause birth defects in humans does so through a cyclic AMP mechanism. Holmes Test., Tr. 11/16/93 (Late Afternoon) at 38.

91. Dr. Newman believes that vascular disruption caused by sympathomimetics is another plausible biological mechanism of teratogenesis, Newman Test., Tr. 11/12/93 at 43–44, but he has done no research regarding that hypothetical mechanism.

92. Whatever scientific evidence chick cell or chick embryo studies may provide for formulating plausible biologic mechanism theories, they provide no scientific evidence of what actually occurs in human fetal development.

93. While I find that Dr. Newman is an expert in cell biology, I find that he is not qualified in the area of human fetal development. His theory assumes that cyclic AMP is the only chemical active in limb development, while those who are expert in human fetal limb development observe that cyclic AMP is one of hundreds of factors that affect limb development. Holmes Test., Tr. 11/16/93 (Late Afternoon) at 38–39.

94. Dr. Newman has not performed any experiment to establish what level of the accused drugs, alone or in combination, can be consistently administered to chick embryos and have no effect. His experimental approach is to impact the cell with whatever amount will cause a malformation. He assumes that "if an agent can cause a birth defect in a concentration in an animal system, then you have to suppose that it is reasonable that the agent at a lower concentration in a more susceptible individual could cause birth defects as well." Newman Test., Tr. 11/12/93 at 31. This kind of assumption may be useful in a *regulatory* risk-benefit context but has no applicability to issues of causation-in-fact.

95. In his experiments on chick embryos, Dr. Newman has found that disorganized, precocious limb development can be induced under certain circumstances and that this kind of disorganized pattern appears to be the pattern of malformation in TiaNicole. Hence, he has deduced that because the mother had exposure at some level to sympathomimetics during the critical stage of fetal development the exposure was the cause of the child's malformations.

238

Id. at 19. In so doing, he assumes that dose is irrelevant to humans even though he has not even determined that dose is irrelevant to chick embryos. This assumption derives from the risk-benefit aspects of his overall opinion but is untenable in light of the absence of proof that the ingredients of Primatene® Mist and Primatene® Tablets are harmful regardless of dosage. Inherent in Dr. Newman's opinion is the further assumption that the plaintiff mother and fetus were both unusually susceptible to any elevation in cyclic AMP.

96. These assumptions are speculative and not subject to proof, and equate to a res ipsa loquitur approach, i.e., because there appears to have been a differentiation process, there must have been a causative precocious rise in cyclic AMP. The speculative nature of the causation theory as to cyclic AMP is illustrated by Dr. Newman's alternate opinion that the same differentiation process would be equally explained by a sudden rise in blood pressure (vasoconstriction), which may have nothing to do with ingestion of exogenous sympathomimetics (e.g. stress-elevated adrenalin) or with sympathomimetics at all (e.g. a severe asthma attack). Dr. Newman's Test., Tr. 11/12/93 at 43, 101–02; Dr. Greenberger Test., 11/19/93 at 16–19.

C. *Alan K. Done, M.D.*

97. Dr. Done is educated as a pediatrician, pharmacologist and toxicologist. Done Test., Tr. 11/16/93 (Vol. I) at 7. However, he is not a practicing clinician. Done Test., Tr. 11/16/93 (Mid-Morning) at 49. Since 1983, he has been a full-time consultant, primarily acting as a retained expert witness in the area of toxicology. Done Test., Tr. 11/16/93 (Vol. I) at 6, 8; Tr. 11/16/93 (Mid-Morning) at 49. Dr. Done formed his opinion in this case by conducting a survey of published literature. Done Test., Tr. 11/16/93 (Vol. I) at 38.

1. *Dr. Done's Methodology and Conclusions*

98. Dr. Done professes not to subscribe to the methodology generally accepted by the teratology community for determining human teratogenicity. However, he did follow the community's methodology in analyzing the available data as to the teratogenic potential in humans of the Primatene® products. Done Test., Tr. 11/16/93 (Vol. I) at 46–49. Thus, he reviewed human epidemiological data, which he considers the linchpin to determining human teratogenicity, and considered published in vivo and in vitro ani-

mal studies to determine whether a teratogenic effect had been demonstrated in other species and whether plausible biologic mechanisms had been proposed. Done Test., Tr. 11/16/93 (Vol. I) at 40–42; Done Test., Tr. 11/16/93 (Mid-Morning) at 21–22, 43; see Def. Ex. W1.

99. On cross-examination, Dr. Done admitted that he had concluded in his written report that it is "not yet entirely clear" whether the ingredients of Primatene® Tablets or Mist are teratogenic in humans in therapeutic doses. Def. Ex. W1; Done Test., Tr. 11/16/93 (Vol. I) at 42. Dr. Done stated that this was a scientifically valid opinion reached after conducting a scientifically valid investigation. Done Test., Tr. 11/16/93 (Vol. I) at 42–43; Def. Ex. W1.

100. Following the cross-examination of Dr. Done, plaintiff sought to withdraw him as an expert witness. Tr. 11/16/93 (Vol. II) at 4. Plaintiff's counsel explained that he considered Dr. Done's testimony not to be scientifically based, Tr. 11/16/93 (Vol. II) at 3–6, but the court determined that his testimony would remain of record for consideration of all issues pertinent to the Downing hearing.

### 2. Dr. Done's Lack of Epidemiological Support

101. Although Dr. Done is not an epidemiologist, his testimony focused primarily upon epidemiological data. Dr. Done acknowledged that human data is the best data for determining whether a substance is a human teratogen and that epidemiological data is the linchpin to determining human teratogenicity. Done Test., Tr. 11/16/93 (Mid-Morning) at 21–22; Tr 11/16/93 (Mid-Morning) at 43. Dr. Done also searched the literature for case reports, but he did not rely upon them because there were too few and they related to "other kinds of defects." Done Test., Tr. 11/16/93 (Vol. I) at 25.

102. Dr. Done cited eight epidemiologic studies, listed below, in support of his opinion.[18] None of these epidemiologic investiga-

---

[18] The eight epidemiologic studies are (i) an abstract of an as yet unpublished study by Lewis B. Holmes, M.D., E.A. Harvey, A.M Hayes, K.S. Brown, D.A. Schoenfeld and S. Khoshbin entitled *The Teratogenic Effects of Anticonvulsant Monotherapy: Phenobarbital, Carbamazepine and Phenytoin*, 41 Teratology 565 (1990); (ii) an article written by Pamela Asselton & Herschel Jick entitled *First Trimester Drug Use And Congenital Disorders*, 65 Obst. & Gynec. 451 (April 1985) ("Asselton & Jick"); (iii) an article written by J.F. Farrar and I.J. Mackie

tions provides a positive study to support an opinion that Primatene® Tablets or Mist or their ingredients cause limb malformations in humans at therapeutic doses. In reviewing these eight studies on cross-examination, Dr. Done admitted that they do not comprise repeated, consistent epidemiologic studies that would support an opinion of teratogenicity in humans:

a. The study by Dr. Holmes relates to phenobarbital use by women suffering from chronic seizure disorders. Holmes Test., Tr. 11/16/93 (Vol. II) at 30–31; Done Test., Tr. 11/16/93 (Vol. I) at 43–44. Based upon this study, Dr. Holmes is of the opinion that, at specific high doses, phenobarbital can be teratogenic in humans.[19] Holmes Test., Tr. 11/16/93 (Late Afternoon) at 14, 16. As Dr. Done acknowledged, however, the therapeutic dose of phenobarbital for chronic seizure control is far greater than the amount contained in a Primatene® Tablet. Done Test., Tr. 11/16/93 (Vol. I) at 44. Moreover, the congenital malformations identified by Dr. Holmes are not present here and specifically did not include limb malformations. Done Test., Tr. 11/16/93 (Vol. I) at 45.

---

entitled *Survey of Possible Causes of Congenital Malformations*, 2 Med. J. Australia 702 (1964) ("Farrar & Mackie"); (iv) an article by Matilda Nelson and John Forfar entitled *Associations between Drugs Administered during Pregnancy and Congenital Abnormalities of the Fetus*, 1971 Brit. Med. J. 523 ("Nelson & Forfar"); (v) an article by Gustav Granroth, Jaason Haapakoski and Lauri Saxen entitled *Defects of the Central Nervous System in Finland: V. Multivariate Analysis of Risk Indicators*, 7 Int'l J. Epidemiol. 301 (1978) ("Granroth"); (vi) an article by Gilbert Mellin entitled *Drugs in the First Trimester of Pregnancy and the Fetal Life of Homo Sapiens*, 1964 Am. J. Obst. & Gynec. 1169 ("the Fetal Life Study"); (vii) a book by O.P. Heinonen, D. Slone and S. Shapiro entitled *Birth Defects and Drugs in Pregnancy* (1977) regarding a study known as the National Collaborative Perinatal Project ("the Heinonen Study" or "the NCPP"); and (viii) an article by K. Rothman entitled *Exogenous Hormones and Other Drug Exposures of Children with Congenital Heart Disease*, 109 Am. J. Epidemiol. 433 (1979) ("Rothman"). Done Test., Tr. 11/16/93 (Vol. I) at 13–21; Def. Exs. X1, Y1, Y2, Z1, aa, bb. .

[19] Plaintiff's theory, as explained by her expert witnesses, is that the sympathomimetics and methylxanthines in Primatene® Tablets and Mist are teratogenic. This theory does not indict the phenobarbital component of the tablet. See Tilelli Test., Tr. 11/15/93 (Vol. II) at 66 (opinion relates solely to sympathomimetics and methylxanthines); Gilbert Test., Tr. 11/9/93 (Afternoon) at 96–97 (believes sympathomimetics and methylxanthines are responsible).

b. During direct examination, Dr. Done testified that the Asselton & Jick study shows a significant increase in malformations associated with the use of phenylephrine, which is a sympathomimetic. Done Test., Tr. 11/16/93 (Vol. I) at 19. On cross-examination, however, Dr. Done admitted that the study shows that there is no association whatsoever between limb disorders and any of the drugs studied, Done Test., Tr. 11/16/93 (Vol. I) at 52, and that the authors repeatedly conclude in their article that "no strong associations between any of the commonly used drugs and the congenital disorders studied were present." Def. Ex. X1; Done Test., Tr. 11/16/93 (Vol. I) at 51, 54. Dr. Done then testified that Asselton & Jick does not support his opinions and that he did not rely upon Asselton & Jick at all. Done Test., Tr. 11/16/93 (Vol. I) at 54–55.

c. The Farrar & Mackie study relates to ten malformed births observed at a hospital in Sydney, Australia in 1961. Def. Ex. Y2; Done Test., Tr. 11/16/93 (Vol. I) at 57. Only one of those births involved a limb malformation. Lieberman Test., Tr. 11/18/93 (Vol. I) at 25. Farrar & Mackie did not find any associations between the ingestion of any sympathomimetic and any malformation. Def. Ex. Y2; Lieberman Test., Tr. 11/18/93 (Vol. I) at 24.

With respect to the drugs at issue, Farrar & Mackie simply noted that certain asthma drugs, such as epinephrine, aminephrine, aminophylline and isoprenaline sulphate, had been used by one mother in the control group and two mothers in the abnormal group. Def. Ex. Y2; Done Test., Tr. 11/16/93 (Vol. I) at 59–60. The study reveals, however, that the 10 women with abnormal births took twenty-five different medications, obviously indicating that some of those women took more than one medication. Def. Ex. Y2; Done Test., Tr. 11/16/93 (Vol. I) at 61–62. Because there is no breakdown of which women took which drugs, one cannot determine whether the two women in the abnormal group who took asthma medications also took other medications. Done Test., Tr. 11/16/93 (Vol. I) at 62–63.[20]

---

[20] The only conclusion drawn by Farrar & Mackie, albeit a tentative one, is that "tetracyclines, when administered in early pregnancy, cause an increased incidence of cataract in the new-born baby." Def. Ex. Y2; Done Test., Tr. 11/16/93 (Vol. I) at 63–64. Dr. Done admits that that finding is now known to be *incorrect*. Done Test., Tr. 11/16/93 (Vol. I) at 64.

Dr. Done made his own calculations from Farrar & Mackie's data to contend that there is an increased incidence of malformations among those exposed to the asthma medications, but he admitted that he does not know the type, amount, route of administration or timing of the asthma drugs taken by the mother in the normal group or the two mothers in the abnormal group and did not have any information with regard to the nature of the malformations observed. Done Test., Tr. 11/16/93 (Vol. I) at 63, 78. Moreover, Dr. Done acknowledges that Farrar & Mackie did not attempt to take into account genetic histories, chromosomal problems or other factors that relate to birth abnormalities. Done Test., Tr. 11/16/93 (Vol. I) at 78. Dr. Done conceded that, in a well-designed and scientifically valid study, such factors would have to be investigated and analyzed. Done Test., Tr. 11/16/93 (Vol. I) at 79.

d. Nelson & Forfar studied, among other things, bronchodilator use during pregnancy. Done Test., Tr. 11/16/93 (Vol. I) at 69–71. That study concluded as follows: "No differences were evident between the two groups. Ephedrine, theophylline, and isoprenaline were the commonest drugs taken." See Def. Ex. Y1. Accordingly, there was no association demonstrated between bronchodilators and malformations. Done Test., Tr. 11/16/93 (Vol. I) at 72; Lieberman Test., Tr. 11/18/93 (Vol. I) at 26.

e. Granroth studied the potential causes of congenital central nervous system defects occurring in Finland. Def. Ex. Z1. He found no statistically significant positive association between the use of sympathomimetics and central nervous system disorders. Lieberman Test., Tr. 11/18/93 (Vol. I) at 31.[21]

Regarding sympathomimetics, Granroth developed both a crude odds ratio, which does not account for any confounding factors, and an adjusted odds ratio, which does account for confounders. Lieberman Test., Tr. 11/18/93 (Vol. I) at 29. While the crude odds ratio was 1.6, after accounting for a variety of

---

[21] While unable to detect single risk factors, Granroth did reach two conclusions. First, maternal age over 34 and multiparity with previous stillbirths was associated with central nervous system disorders. Def. Ex. Z1; Done Test., Tr. 11/16/93 (Vol. I) at 75. Second, Granroth found that an influenza outbreak and use of salicylates, such as aspirin, were risk factors as well. Def. Ex. Z1; Done Test., Tr. 11/16/93 (Vol. I) at 76.

243

confounders identified in the report, Granroth's adjusted odds ratio was 1.3, which was not statistically significant. Lieberman Test., Tr. 11/18/93 (Vol. I) at 30. On cross-examination, Dr. Done acknowledged that Granroth did not reach any positive conclusions with respect to either sympathomimetics or methylxanthines. Def. Ex. Z1; Done Test., Tr. 11/16/93 (Vol. I) at 76.

f. The Fetal Life Study relates to a number of ingestions of a number of drugs in one particular hospital in New York City in 1953. Def. Ex. aa; Done Test., Tr. 11/16/93 (Mid-Morning) at 4. The study did not find any associations between any malformations and any sympathomimetic drug. Lieberman Test., Tr. 11/18/93 (Vol. I) at 32. Nor is there any conclusion drawn with respect to the teratogenic impact or potential of any of the ingredients of Primatene® Tablets or Mist. Def. Ex. aa; Done Test., Tr. 11/16/93 (Mid-Morning) at 6. Although Dr. Done claims to find some support in the Fetal Life Study, he agrees that it is an inconclusive report. Done Test., Tr. 11/16/93 (Mid-Morning) at 4.

g. The Heinonen study is one of the larger studies regarding the use of drugs during pregnancy. Done Test., Tr. 11/16/93 (Mid-Morning) at 7. It was conducted between 1959 and 1965, originally to study risk factors for cerebral palsy and central nervous system development. Lieberman Test., Tr. 11/18/93 (Vol. I) at 35. The study enrolled over 50,000 mother/child pairs and collected a wide variety of information at each prenatal visit. Lieberman Test., Tr. 11/18/93 (Vol. I) at 35–36. Comparing several dozen kinds of malformations with several hundred kinds of drugs, the authors of the Heinonen study made over 10,000 comparisons. Lieberman Test., Tr. 11/18/93 (Vol. I) at 36. With that number of comparisons, 500 comparisons would appear statistically significant simply by chance even using 95% confidence intervals. Lieberman Test., Tr. 11/18/93 (Vol. I) at 37. As a result, the authors caution the reader at the beginning of their book that "[n]one of the associations presented in this book should be regarded as anything more than hypotheses requiring independent confirmation." Def. Ex. bb; Done Test., Tr. 11/16/93 (Mid-Morning) at 8; Lieberman Test., Tr. 11/18/93 (Vol. I) at 37. Dr. Done agreed on cross-examination that, in light of that caution, further investigation would be needed before anyone could draw conclu-

244

sions regarding the drugs studied in that book. Done Test., Tr. 11/16/93 (Mid-Morning) at 9. In any event, Heinonen did not discover any statistically significant positive associations for any of the ingredients at issue here. Lieberman Test., Tr. 11/18/93 (Vol. I) at 38.

h. The Rothman article found a positive association between cardiovascular defects and exposure to phenobarbital, phenothiazines and exogenous hormones. Done Test., Tr. 11/16/93 (Mid-Morning) at 10–11. The only sympathomimetic drug addressed by Rothman is phenylephrine, which is not found in either Primatene® Tablets or Mist. Done Test., Tr. 11/16/93 (Mid-Morning) at 10. Rothman noted that, because the Heinonen study did not show a positive association between exposure to these drugs and heart defects, the discrepancy must be resolved by larger studies. Done Test., Tr. 11/16/93 (Mid-Morning) at 11; Lieberman Test., Tr. 11/18/93 (Vol. I) at 40–41.

103. Not one of the foregoing studies cited by Dr. Done shows a statistically significant increased risk of limb defects associated with therapeutic use of any of the ingredients of Primatene® Tablets or Mist. Moreover, each has express limitations and cautions which advise that one should not rely upon the observations as conclusions. As a result, neither an epidemiologist nor any other teratologic investigator would reasonably rely upon any of those studies to draw a conclusion that those ingredients can cause limb defects in humans at therapeutic doses. Lieberman Test., Tr. 11/18/93 (Vol. I) at 45.

104. Before Dr. Done became involved in this litigation, he had prepared for presentation to a workshop of the American Academy of Pediatrics an outline regarding the teratogenic potential of drugs used during early pregnancy. Done Test., Tr. 11/16/93 (Mid-Morning) at 13–14; see Def. Ex. cc. Dr. Done presented at that workshop lists of proven and probable human teratogens, and sought to express valid scientific opinions. Done Test., Tr. 11/16/93 (Mid-Morning) at 14–15; Def. Ex. cc. With the exception of the Holmes abstract and the Asselton & Jick study, each of the epidemiological studies Dr. Done cited at the hearing predated his presentation. Done Test., Tr. 11/16/93 (Mid-Morning) at 20. Nevertheless, Dr. Done did not include Primatene® Tablets or Mist or the ingredients

of either on his lists of human teratogens. Def. Ex. cc; Done Test., Tr. 11/16/93 (Mid-Morning) at 14–15.

105. Similarly, in 1983, the year TiaNicole Greaux was born, Dr. Done wrote a column in the publication "Emergency Medicine." See Def. Ex. dd. Dr. Done's column was called *The Toxic Emergency*, and he intended its contents to be scientifically and medically valid and reliable. Def. Ex. dd; Done Test., Tr. 11/16/93 (Mid-Morning) at 18–19. Dr. Done's column contained a table of Drugs with Probable Human Teratogenicity. Def. Ex. dd; Done Test., Tr. 11/16/93 (Mid-Morning) at 18–19. With the exception of the Holmes abstract and the Asselton & Jick study, each of the epidemiological studies Dr. Done cited at the hearing predated his column. Done Test., Tr. 11/16/93 (Mid-Morning) at 20. Nevertheless, he did not list in the table of human teratogens set forth in the column any of the ingredients of Primatene® Tablets or Mist. Def. Ex. dd; Done Test., Tr. 11/16/93 (Mid-Morning) at 19.

## 2. *Dr. Done's Opinions Regarding Mechanisms*

106. Dr. Done is not an embryologist, but he believes that the likely biological mechanism relates to the elevation of cyclic AMP. Done Test., Tr. 11/16/93 (Mid-Morning) at 28–31. Yet, he cannot eliminate vasoconstriction as an equal potential mechanism of teratogenesis. Done Test., Tr. 11/16/93 (Mid-Morning) at 29. Contrary to each of plaintiff's other causation witnesses, he does not believe that all sympathomimetics are teratogenic in humans. Done Test., Tr. 11/16/93 (Mid-Morning) at 28, 36, 48. For example, he believes that pseudoephedrine is not teratogenic in humans and that he is unaware of any data showing Isuprel® to be a human teratogen. Done Test., Tr. 11/16/93 (Mid-Morning) at 28, 36, 48.

## 3. *Dr. Done's Animal Data*

107. Dr. Done also claimed to have based his opinion on Dr. Gilbert's chick embryo studies and rabbit study. See Ex. W1. Dr. Done, however, acknowledged the phenomenon of species specificity and also recognized that many animal studies involve high dosages and abnormal routes of administration. Done Test., Tr. 11/16/93 (Mid-Morning) at 38–41. Because of these factors, Dr. Done agreed with defense experts that one should not rely upon animal studies alone, whether in vivo or in vitro, in determining whether an agent is a human teratogen. Done Test., Tr. 11/16/93 (Mid-Morning) at 37–40. A positive animal study merely suggests that there might be

a need to study the agent in humans. Done Test., Tr. 11/16/93 (Mid-Morning) at 42. For these reasons, Dr. Done cannot reasonably rely upon Dr. Gilbert's chick studies or rabbit study to render an admissible opinion that Primatene Mist or Tablet ingredients are teratogenic in humans.

D. *John A. Tilelli, M.D.*

108. Dr. Tilelli is a pediatric and intensive care physician affiliated with Critical Care Pediatrics, P.A., and the Arnold Palmer Hospital in Orlando, Florida. Tilelli Test., Tr. 11/15/93 (Vol. I) at 3.

### 1. *Dr. Tilelli's Qualifications and Methodology*

109. Dr. Tilelli is a "self-taught" toxicologist. Tilelli Test., Tr. 11/15/93 (Vol. I) at 4; Tilelli Test., Tr. 11/15/93 (Vol. II) at 27. Toxicology is the study of the side effects of overdoses of substances foreign to the body. Tilelli Test., Tr. 11/15/93 (Vol. I) at 5–6, 19.

110. Dr. Tilelli's opinions in this case are based entirely upon his review of selected literature. Tilelli Test., Tr. 11/15/93 (Vol. II) at 28. Dr. Tilelli first reviewed that literature and formed his opinions regarding sympathomimetics in connection with his retention as an expert witness in another action. Tilelli Test., Tr. 11/15/93 (Vol. II) at 28–29. In that other litigation, he received some of the literature from the attorney who had retained him. Tilelli Test., Tr. 11/15/93 (Vol. II) at 29.

111. Dr. Tilelli is neither a teratologist nor a research scientist. Tilelli Test., Tr. 11/15/93 (Vol. I) at 6, 18. The only teratology study in which he has even been involved tangentially is Dr. Gilbert's rabbit study, the manuscript of which Dr. Tilelli rewrote and submitted to Veterinary and Human Toxicology without reviewing the underlying laboratory notes and recorded data. Tilelli Test., Tr. 11/15/93 (Vol. I) at 11; Tr. 11/15/93 (Vol. II) at 22.

112. Dr. Tilelli describes himself as a clinician who spends 80–90% of his time treating patients. Tilelli Test., Tr. 11/15/93 (Vol. I) at 6. Dr. Tilelli's clinical experience does not include the regular treatment or diagnosis of children with birth defects; perinatologists at his hospital fill that role. Tilelli Test., Tr. 11/15/93 (Vol. II) at 22. Although Dr. Tilelli sees himself as someone who might be contacted by a physician regarding the safety of using a drug during pregnancy, he is rarely, if ever, called upon to offer such advice. Tilelli Test., Tr. 11/15/93 (Vol. I) at 12–14.

113. In considering the use of drugs during pregnancy, Dr. Tilelli takes into account epidemiological data, case reports, animal

247

studies and biological mechanisms. Tilelli Test., Tr. 11/15/93 (Vol. I) at 20–21. Because his opinion constitutes a prospective risk/benefit analysis, it is not helpful to an after-the-fact determination of whether a drug actually causes a defect in humans at therapeutic dosages. Tilelli Test., Tr. 11/15/93 (Vol. I) at 14–17; Tr. 11/15/93 (Vol. II) at 31–34.

## 2. *Dr. Tilelli's Lack of Epidemiological Support*

114. In offering a prospective risk/benefit analysis, he relies upon epidemiology only as one source of information, and does not accord epidemiological data the weight that teratologists give it in making retrospective, cause-in-fact determinations. Tilelli Test., Tr. 11/15/93 (Vol. I) at 12–17. Dr. Tilelli does not regularly review epidemiological journals. Tilelli Test., Tr. 11/15/93 (Vol. II) at 30.

115. Dr. Tilelli does not, and cannot, cite to repeated, consistent epidemiological studies in support of his opinions. Tilelli Test., Tr. 11/15/93 (Vol. II) at 49–50.

116. At his deposition, Dr. Tilelli testified that, with the exception of the Werler study, he did not rely upon any epidemiological data in support of his opinion that sympathomimetics are human teratogens. Tilelli Test., Tr. 11/15/93 (Vol. II) at 38–39. At the hearing, however, Dr. Tilelli cited four other studies: Heinonen, Fetal Life, Nelson & Forfar and Asselton & Jick. Tilelli Test., Tr. 11/15/93 (Vol. II) at 38–40, 47.

117. None of the studies cited by Dr. Tilelli at the hearing is the type upon which an epidemiologist would reasonably rely to draw a conclusion that the ingredients of Primatene® Tablets or Mist can cause limb defects in humans at therapeutic doses. Moreover, Dr. Tilelli considers the Heinonen study to be inconclusive, with the study merely suggesting hypotheses. Tilelli Test., Tr. 11/15/93 (Vol. II) at 39, 46–47. He also recognizes the Fetal Life Study as inconclusive and unhelpful, and admits that Nelson & Forfar involved only one child with a limb defect. See Tilelli Test., Tr. 11/15/93 (Vol. I) at 29. Further, Dr. Tilelli concluded that Asselton & Jick is not a positive study. Tilelli Test., Tr. 11/15/93 (Vol. I) at 30. Finally, Dr. Tilelli acknowledges that Werler did not find any statistically significant association between pseudoephedrine and limb defects and concludes that the study does not provide him support for his opinions concerning causation. Tilelli Test., Tr. 11/15/93 (Vol. II) at 39, 41, 43.

### 3. *Dr. Tilelli's Anecdotal Human Data*

118. Dr. Tilelli relies upon anecdotal case reports, Tilelli Test., Tr. 11/15/93 (Vol. II) at 13–14, a type of data that is not relied upon by teratologists in making retrospective, cause-in-fact determinations. Holmes Test., Tr. 11/16/93 (Late Afternoon) at 45.

119. Dr. Tilelli concedes that case reports have inherent limitations. Tilelli Test., Tr. 11/15/93 (Vol. II) at 50. Case reports relate temporal associations that could be chance events or could be the result of confounding factors. Tilelli Test., Tr. 11/15/93 (Vol. II) at 50. Consequently, Dr. Tilelli concedes that, if one relies upon case reports, one could reach a false positive conclusion regarding the association reported. Tilelli Test., Tr. 11/15/93 (Vol. II) at 51.

120. Dr. Tilelli cited three items of anecdotal data in support of his risk/benefit analysis. First, he cited Dr. Gilbert's Tedral® case report. Tilelli Test., Tr. 11/15/93 (Vol. II) at 51–54. Dr. Tilelli also referred to a single page, unpublished abstract by Buehler that he learned about only by reading the deposition of another of plaintiff's expert witnesses, John D. Palmer, M.D., Ph.D. Tilelli Test., Tr. 11/15/93 (Vol. II) at 52–53. That abstract, however, relates to phenylpropanolamine, Tilelli Test., Tr. 11/15/93 (Vol. II) at 53, a sympathomimetic that is not found in either Primatene® Tablets or Mist. Although that abstract purportedly refers to reports to the Food and Drug Administration, Dr. Tilelli has never seen any of those reports. Tilelli Test., Tr. 11/15/93 (Vol. I) at 27; Tr. 11/15/93 (Vol. II) at 52–53. Finally, he referred to a product liability litigation in which he participated that involved several different drugs, only some of which contained sympathomimetics, and he agreed that the presence of the various drugs, in addition to the sympathomimetics, presented confounding factors that could not be discounted. Tilelli Test., Tr. 11/15/93 (Vol. IV) at 2. Therefore, these asserted bases for his opinion are unreliable both on their face and by his admission.

### 4. *Dr. Tilelli's Opinions Regarding Mechanisms*

21. Nevertheless, Dr. Tilelli subscribes to the two possible biological mechanisms posited by other plaintiff's experts: elevation of cyclic AMP and vasoconstriction. Tilelli Test., Tr. 11/15/93 (Vol. I) at 23–25; Tr. 11/15/93 (Vol. II) at 18.

122. Dr. Tilelli agrees with defendant's experts that things which are biologically reasonable in an animal model do not necessarily

249

occur in human fetal development. Tilelli Test., Tr. 11/15/93 (Vol. I) at 25.

### 5. *Dr. Tilelli's Animal Data*

123. Dr. Tilelli's prospective risk/benefit analysis uses animal data to suggest the possibility of a teratogenic effect in humans, Tilelli Test., Tr. 11/15/93 (Vol. I) at 13–14, yet he acknowledges that evidence of teratogenicity in one species is not a firm basis for concluding that the agent will be teratogenic in another species due to species specificity, different routes of administration, metabolism, duration of exposure and other biologic factors. Tilelli Test., Tr. 11/15/93 (Vol. II) at 59, 60–62.

124. The animal data upon which Dr. Tilelli principally relied come from Dr. Gilbert's chick embryo studies and her rabbit study, Tilelli Test., Tr. 11/15/93 (Vol. II) at 14–15, 64; Tr. 11/15/93 (Vol. IV) at 3–4. However, it is important to note that Dr. Tilelli used the rabbit study only to conclude that, *at a certain dosage level,* malformations can result. Tilelli Test., Tr. 11/15/93 (Vol. II) at 16–17. Because the dosages of Primatene® administered in Dr. Gilbert's rabbit study were two to five times the usual per body weight of what a human could take, Dr. Tilelli could not have determined from the rabbit test that a therapeutic dose in humans would result in a malformation. Tilelli Test., Tr. 11/15/93 (Vol. II) at 16–17. In any event, because Dr. Tilelli's opinion is based, at least in part, upon Dr. Gilbert's rabbit study, his overall opinion is scientifically flawed and legally inadmissible.

### 6. *Dr. Tilelli's Revision of Dr. Gilbert's Rabbit Study*

125. There are gross discrepancies between the rabbit test as it was conducted and as it was reported by Dr. Tilelli in the manuscript submitted to Veterinary and Human Toxicology. Currently, Dr. Tilelli does not believe his manuscript is publishable because of discrepancies established at this Downing hearing. Tilelli Test., Tr. 11/15/93 (Vol. III) at 41, 53–54.

126. Dr. Tilelli did not learn about Dr. Gilbert's rabbit study until after it had been completed and rejected by *Teratology.* Tilelli Test., Tr. 11/15/93 (Vol. II) at 71; see Gilbert Test., Tr. 11/9/93 (Afternoon) at 77. Dr. Tilelli had never before collaborated with Dr. Gilbert, and did not know her prior to his involvement in this case. Tilelli Test., Tr. 11/15/93 (Vol. II) at 70, 72.

127. Dr. Tilelli's report misrepresented the number of rabbits used in the study. Tilelli Test., Tr. 11/15/93 (Vol. II) at 75, 78. He

250

reported that there were 21 rabbits, but was later told that there were only 13 rabbits, some of which were subjected to repeated matings. Tilelli Test., Tr. 11/15/93 (Vol. II) at 78. In fact, there were 16 rabbits. Christian Test., Tr. 11/18/93 (Vol. II) at 20; see Def. Ex. L.

128. Dr. Tilelli's report also misrepresented the dosage concentrations given to the rabbits. Ms. Spennetta originally administered 1 milliliter ("ml") of the Primatene® solution as the low dose and 2 ml as the high dose. See Def. Ex. L. After experiencing difficulty in administering the second milliliter of the high dose, she doubled the concentration in the solution and used 0.5 ml as the low dose and 1 ml in the high dose. See Def. Ex. L. Dr. Tilelli's report did not indicate either what the initial concentration levels were or that the concentration levels had changed in the middle of the study. See Def. Ex. X.

129. Dr. Tilelli's report also misrepresented the number of defects found. One of the drafts sent by Dr. Gilbert indicates that there were three rabbits born with midline defects. See Def. Ex. U. Dr. Tilelli's report, however, erroneously indicates that there were four rabbits born with midline defects. See Def. Ex. X; Tilelli Test., Tr. 11/15/93 (Vol. III) at 37. Dr. Tilelli could not explain the difference, but admitted that it is a significant difference and that its impact on the study's conclusions must be evaluated. Tilelli Test., Tr. 11/15/93 (Vol. III) at 36–38, 52. Dr. Tilelli's report also erroneously indicates that one of the midline defects occurred in a "high dose" pup, when in fact all incidences of defects occurred in rabbits from "low dose" treatment groups. Tilelli Test., Tr. 11/15/93 (Vol. III) at 49; see Def. Ex. X.

130. Dr. Tilelli's report also misrepresented the procedure followed for mating male rabbits. He stated that male rabbits were given a three-day rest period between matings to ensure sufficient sperm count, and attributed to Primatene® the failure of fertility in treated rabbits. See Def. Ex. X. Upon learning during cross-examination that not all males were given the full sperm recovery period, Dr. Tilelli admitted that that was an equally likely explanation for the failure of fertility. Tilelli Test., Tr. 11/15/93 (Vol. III) at 15–22; see Def. Exs. L, M1, Y.

131. Dr. Tilelli's report also reports different measurements of the rabbits from those in Dr. Gilbert's manuscript. Compare Def. Ex. U; Tilelli Test., Tr. 11/15/93 (Vol. III) at 29 with Def. Ex. X; Tilelli Test., Tr. 11/15/93 (Vol. III) at 29. Dr. Tilelli could not explain the difference. Tilelli Test., Tr. 11/15/93 (Vol. III) at 30.

132. Dr. Tilelli's report also misrepresented Ms. Spennetta's background. Although Ms. Spennetta was an animal resources co-ordinator for Promega Laboratories, Dr. Tilelli identified her as a member of the University of Wisconsin Department of Pathology. Tilelli Test., Tr. 11/15/93 (Vol. II) at 84.

133. Other deficiencies included Dr. Tilelli's failure to report that (i) breeding histories were missing for four of the rabbits, (ii) a control litter of nine pups died post–partum, and (iii) that the limbs and torsos of the parents were never measured.

134. Dr. Tilelli was not cognizant of these errors until he was cross-examined. He admitted that, in light of what he learned during cross-examination, his report was not currently publishable. Tilelli Test., Tr. 11/15/93 (Vol. III) at 41, 53–54. Some of his errors are due to his failure to review the data underlying the rabbit test and other errors are due to his failure to review carefully the prior drafts of the report that he was given. Dr. Tilelli's causation opinion, then, which is dependent upon the rabbit study as he had reported it, is inadmissible.

E. *John D. Palmer. M.D., Ph.D.*

135. Dr. Palmer is a pharmacologist and toxicologist. Palmer Dep. (6/12/92) at 6, 198.

### 1. *Dr. Palmer's Qualifications and Methodology*

136. Dr. Palmer is not board certified in any field. Palmer Dep. (6/12/92) at 8. He practices medicine in the field of internal medicine. While his sub-specialty of clinical pharmacology relates to the effects of chemicals on human beings, Dr. Palmer's medical practice does not include investigating or treating children with birth defects. Palmer Dep. (6/12/92) at 12–14.

137. Dr. Palmer is not a teratologist and does not belong to the Teratology Society. Palmer Dep. (6/12/92) at 26. Dr. Palmer has never conducted or designed an animal teratology study, Palmer Dep. (6/12/92) at 10, and has not conducted either experiments or clinical investigations into the teratogenicity of Primatene® Tablets, Mist or any of their ingredients. Palmer Dep. (6/12/92) at 31. Dr. Palmer also formed his opinion based solely upon a review of selected literature.

138. Dr. Palmer does not follow the methodology generally accepted by the community of teratologists. Palmer Dep. (6/12/92) at 15. Unlike the community, Dr. Palmer in reaching his conclusions

252

relies upon (i) reported experimental data, both in vitro and in vivo, from a variety of species, and (ii) drug experience reports or case reports. Palmer Dep. (6/12/92) at 15–16. Dr. Palmer does not consider human epidemiologic data necessary to reach a conclusion. Instead, he accepts anecdotal case reports in lieu of positive epidemiological studies. Palmer Dep. (6/12/92) at 16.

139. Drug experience reports are not peer reviewed data. Palmer Dep. (6/12/92) at 19. Dr. Palmer acknowledges that drug experience reports do not define a cause-effect relationship and he does not view them as evidence of causation. Palmer Dep. (6/12/92) at 19–21. See Lieberman Test., Tr. 11/18/93 (Vol. I) at 18, 48.

140. Dr. Palmer's opinions with respect to sympathomimetics are based upon chick embryo studies, Dr. Gilbert's rabbit study, Dr. Gilbert's Tedral® case report, the Heinonen study and, "in an ancillary way," the single page abstract prepared by Buehler that does not deal with any of the ingredients of Primatene® Tablets or Mist. Palmer Dep. (6/12/92) at 36–46, 74, 104–122. The limited value of each of these pieces of data has already been discussed. Reliance on these articles or studies renders his causation opinion inadmissible.

141. Because Dr. Palmer's opinion is based in part upon Dr. Gilbert's rabbit study, his opinion is scientifically flawed and legally inadmissible.

## V. Plaintiff's Expert Opinions Regarding Specific Causation

142. To satisfy specific causation, plaintiff's expert witnesses were required to exclude all other possible causes of TiaNicole Greaux's defects. Each of plaintiff's expert witnesses who addressed specific causation conclusorily asserted that he or she had done so. As set forth below, however, there are a number of confounding factors that plaintiff's witnesses either did not exclude or could not have possibly excluded.

A. *Unknown Causes of Birth Defects*

143. Plaintiff attempts to overcome the insufficiency her general causation proof by proceeding directly to proof of specific causation. Because plaintiff's experts opine that the accused drugs *might* be teratogenic in humans, and because they claim to have eliminated other possible causes of TiaNicole's malformation, plaintiff concludes that the drugs must have caused the malformation in

253

this case. Plaintiff's proposed proof by a process of elimination fails, however, in light of the fact that the majority of birth defects, as many as 65%, have no ascertainable cause. Cohen Test., Tr. 11/10/93 at 25; Done Test., Tr. 11/16/93 (Mid-Morning) at 32; Palmer Dep. (6/12/92) at 14. Without proof to a reasonable degree of scientific certainty that the accused drugs are teratogenic in humans, it is impossible to exclude as a possible cause of TiaNicole Greaux's defects whatever may be responsible for the majority of birth defects. See Done Test., Tr. 11/16/93 (Mid-Morning) at 34–35.

B. *Endogenous Epinephrine*

144. Each of plaintiff's expert witnesses has opined that epinephrine, whether exogenous or endogenous, is teratogenic in humans and has acknowledged that epinephrine is an endogenously produced sympathomimetic that the body produces at elevated levels under various circumstances. Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 18; Done Test., Tr. 11/16/93 (Mid-Morning) at 31; Tilelli Test., Tr. 11/15/93 (Vol. II) at 67–69. According to Dr. Gilbert, "[e]verybody has certain surges of [endogenous epinephrine] every day in their lives." Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 19. Dr. Tilelli testified that any kind of physiological stress could raise levels of endogenous epinephrine. Tilelli Test., Tr. 11/15/93 (Vol. II) at 69–70.

145. Those of plaintiff's expert witnesses who have addressed the point each agreed that, pharmacologically, there is no difference between endogenous epinephrine and the epinephrine in Primatene® Mist. Done Test., Tr. 11/16/93 (Mid-Morning) at 31; Tilelli Test., Tr. 11/15/93 (Vol. II) at 68; Newman Test., Tr. 11/12/93 at 79–79; Palmer Dep. (6/12/92) at 55, 62. Accordingly, the same blood level of endogenous or exogenous epinephrine should produce the same effects. Tilelli Test., Tr. 11/15/93 (Vol. II) at 68; Newman Test., Tr. 11/12/93 at 79. None of plaintiff's expert witnesses, however, has an opinion as to the blood level at which sympathomimetics are teratogenic in humans. See Tilelli Test., Tr. 11/15/93 (Vol. II) at 68–69; Newman Test., Tr. 11/12/93 at 78, 80–81, 83; Palmer Dep. (6/12/92) at 60.

146. If, as plaintiff's expert witnesses contend, epinephrine is a human teratogen, it is impossible to exclude plaintiff's endogenous epinephrine as a cause of TiaNicole's defects. Under plaintiff's theory, there is no way to state that a malformation was caused by

254

exogenous rather than endogenous sympathomimetics. Plaintiffs could not and did not exclude as possible causes of TiaNicole Greaux's defects the mother's endogenous epinephrine or any stress that might have led to a rise in her endogenous epinephrine levels. Tilelli Test., Tr. 11/15/93 (Vol. II) at 70; Done Test., Tr. 11/16/93 (Mid-Morning) at 31, 34; Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 20. Dr. Tilelli, for example, testified that a mother's endogenous sympathomimetics may explain the background rate of defects, or why certain defects occur spontaneously. Tilelli Test., Tr. 11/15/93 (Vol. II) at 67–68. Indeed, Dr. Tilelli testified that any kind of physiological stress would render a fetus vulnerable to birth defects. Tilelli Test., Tr. 11/15/93 (Vol. II) at 69–70. Similarly, Dr. Done testified that any stress that plaintiff may have experienced in the first 90 days of her pregnancy could have harmed the fetus. Done Test., Tr. 11/16/93 (Mid-Morning) at 35.

147. Accordingly, because plaintiff's experts all assert that all epinephrine is teratogenic, they cannot possibly exclude plaintiff's natural body processes as a cause of the defects in TiaNicole Greaux.

C. *Isuprel®*

148. Contemporaneous medical records, generated both before and after TiaNicole Greaux's birth, reflect that plaintiff used Isuprel® during her pregnancy. See Def. Exs. I, J; Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 46–47, 55.

149. Isuprel® contains a sympathomimetic, and each of plaintiff's experts, except for Dr. Done,[22] believes that, if Isuprel® had been used by plaintiff as indicated by the records, they would be unable to exclude it as a cause of the child's defects. See Gilbert-Barness Test., Tr. 11/9/93 (Morning) at 35; Gilbert-Barness Test., Tr. 11/9/93 (Afternoon) at 59–60.; Palmer Dep. (6/12/92) at 148–151.

D. *Plaintiff's Prior Abortions*

150. Prior to giving birth to TiaNicole, plaintiff had multiple abortions, both spontaneous and elective. Done Test., Tr. 11/16/93 (Mid-Morning) at 24.

151. Dr. Done acknowledged during cross-examination that there is some data associating fetal malformations with prior elec-

---

[22] Dr. Done is unaware of any evidence regarding the teratogenicity in humans of Isuprel®, even though it is a sympathomimetic. Done Test., Tr. 11/16/93 (Mid-Morning) at 36.

tive and spontaneous abortions. Done Test., Tr. 11/16/93 (Mid-Morning) at 24.

152. Dr. Done testified that, in addressing specific causation, one would have to consider the effect that plaintiff's prior abortions may have had on her pregnancy with TiaNicole. Done Test., Tr. 11/16/93 (Mid-Morning) at 24. Dr. Done, however, did not and could not exclude plaintiff's prior abortions as a potential cause of TiaNicole's defects. Done Test., Tr. 11/16/93 (Mid-Morning) at 34.

E. *Plaintiff's Asthma*

153. Many of plaintiff's expert witnesses assert that sympathomimetics may have a teratogenic effect because the drugs are vasoconstrictive. Done Test., Tr. 11/16/93 (Mid-Morning) at 29; Tilelli Test., Tr. 11/15/93 (Vol. I) at 23–25; Newman Test., Tr. 11/12/93 at 43–44.

154. Whitehall offered testimony from Paul A. Greenberger, M.D., an expert in asthma and asthma therapies during pregnancy. Greenberger Test., Tr. 11/19/93 (Vol. I) at 5–14. A severe attack of asthma can itself cause vasoconstriction of the uterine artery. Greenberger Test., Tr. 11/19/93 (Vol. I) at 18. This testimony was not challenged or rebutted.

155. To the extent that plaintiff's expert witnesses assert vasoconstriction is a mechanism of teratogenesis, they cannot exclude plaintiff's asthma as a potential cause of TiaNicole Greaux's defects.

F. *Genetics*

156. According to the testimony of plaintiff's geneticist, Dr. Cohen, one can never completely exclude the possibility that a congenital malformation has a genetic etiology. Cohen Test., Tr. 11/10/93 at 32–36. However, Dr. Cohen did testify that he believed, to a reasonable degree of scientific certainty, that TiaNicole's malformations are not of genetic origin. Dr. Cohen based his opinion upon his examination of TiaNicole and several of her family members, information provided by plaintiff, and a review of the genetics literature, which he found had not reported a genetic origin for malformations of the type exhibited in TiaNicole. However, defendant's expert, Dr. Holmes, testified that such a malformation, although extremely rare, has been reported as caused by the spontaneous mutation of a gene or by a recessive genetic disor-

256

der, where other family members have been unaffected. Holmes Test., Tr. 11/16/93 (Late Afternoon) at 10–12. Because Dr. Cohen was apparently unaware of the literature referenced by Dr. Holmes, we conclude that while plaintiff's expert witnesses assert that they have excluded a genetic etiology, they have not actually done so.

G. *Conclusion*

157. Each of plaintiff's expert witnesses who addressed specific causation testified that he or she had excluded other possible causes. Looking behind those conclusory statements, however, it is clear that there are other potential alternative causes that plaintiff's expert witnesses either have not excluded or cannot possibly exclude as a cause of TiaNicole Greaux's birth defects.

## CONCLUSIONS OF LAW

### I. Jurisdiction

1. This Court has jurisdiction over this action pursuant to § 22 of the Revised Organic Act of 1954 and 28 U.S.C. § 1332 (1992).

### II. Necessity of Expert Testimony on Causation

2. Plaintiff has asserted, on behalf of her daughter, claims of strict liability, breach of warranty, negligence and misrepresentation. Causation is a fundamental element of each of plaintiff's claims. See, e.g., Habecker v. Copperloy Corp., 893 F.2d 49, 54 (3d Cir. 1990); Restatement (Second) of Torts (1965) ("Restatement") § 430.

3. Plaintiff's case requires expert testimony to satisfy her burden with respect to both general causation and specific causation. See DeLuca by DeLuca v. Merrell Dow Pharmaceuticals, Inc., 911 F.2d 941, 958 (3d Cir. 1990) (testimony must be able to support a jury finding both (i) that the drug *can* cause birth defects and (ii) that the drug *more likely than not caused* the birth defects in *this particular case*), on remand to 791 F. Supp. 1042 (D.N.J. 1992), aff'd, 6 F.3d 778 (3d Cir. 1993); see In re Agent Orange Product Liability Lit., 611 F. Supp. 1223, 1250 (E.D.N.Y. 1985) (to prove specific causation, plaintiff's expert witnesses must *first* prove general causation and *then* exclude other possible causes for the plaintiff's injury), aff'd, 818 F.2d 187 (2d Cir. 1987), cert. denied, 487 U.S. 1234 (1988). In this case, "general causation" addresses the question of whether the

ingredients of Primatene® products are capable of causing limb malformations in humans at therapeutic dose levels, while "specific causation" addresses whether those ingredients actually did cause TiaNicole Greaux's limb reduction defects.

4. If plaintiff's expert opinion evidence regarding causation is inadmissible or insufficient to sustain a jury verdict in her favor, summary judgment is required to be granted to defendant. Celotex Corp. v. Catrett, 477 U.S. 317 (1986) (summary judgment is proper where a party fails to establish the existence of an element essential to his case and where he bears the burden of proof); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).

### III. The Downing Hearing

■ 5. Where, as here, essential elements of plaintiff's case are entirely dependent upon expert testimony, the trial judge must act as a "gatekeeper" to ensure that all expert testimony or evidence to be heard at trial is not only relevant, but also reliable. Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S. Ct. 2786, 2795 (1993); De-Luca v. Merrell Dow Pharmaceuticals, 791 F. Supp. 1042, 1055 (D.N.J. 1992), aff'd, 6 F.3d 778 (3d Cir. 1993); United States v. Downing, 753 F.2d 1224 (3d Cir. 1985).

6. The hearing conducted by this court from November 9 through November 19, 1993, has produced a record sufficient under the criteria set forth in Daubert, Downing, and DeLuca (i) to determine whether the witnesses proffered by plaintiff possess the necessary expertise to render the opinions they offer under Fed. R. Evid. 702; (ii) to reach "the ultimate determination of whether [such opinion testimony] is 'helpful' and thus admissible" under Fed. R. Evid. 702, (iii) to assess whether data used by plaintiff's witnesses is reasonably relied upon by experts in the field under Fed. R. Evid. 703, (iv) to evaluate whether the expert evidence would be prejudicial or misleading to a jury, (v) to decide whether the expert evidence would be sufficient to sustain a jury verdict in plaintiff's favor and (vi) to exercise the Court's discretion in making those determinations. See DeLuca, 911 F.2d at 957 (citing United States v. Ferri, 778 F.2d 985, 989–91 (3d Cir. 1985), cert. denied, 476 U.S. 1172 (1986)).

■ 7. Based upon the evidence received at the Downing hearing, I conclude that plaintiff's expert opinion evidence is inadmissible under Fed. R. Evid. 702, 703 and 403.

## IV. Inadmissibility Under Fed. R. Evid. 702

8. Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702.

A. *The Qualifications of Plaintiff's Expert Witnesses*

■ 9. Unless expert testimony is rendered by a qualified expert, it must be excluded. Hines v. Consolidated Rail Corp., 926 F.2d 262, 272 (3d Cir. 1991). To render expert opinions, a witness must be sufficiently "qualified as an expert by knowledge, skill, experience, training, or education." See Fed. R. Evid. 702.

■ 10. I conclude that Dr. Done, Dr. Tilelli, Dr. Palmer, Dr. Newman and Dr. Gilbert are not qualified "by knowledge, skill, experience, training or education" to render ultimate conclusions as to whether the Primatene® products and their ingredients can cause birth defects in humans at therapeutic dosage levels or as to whether such products did cause the birth defects suffered by TiaNicole Greaux.

11. Dr. Done has not conducted any epidemiologic studies or engaged in any in vivo or in vitro animal experiments relating to the teratogenicity of any of the products at issue here or the ingredients of such products. Dr. Done's only knowledge or experience regarding the teratogenicity of sympathomimetics comes from his review, for purposes of testifying in litigation, of selected literature appearing in various publications and elsewhere. Accordingly, Dr. Done is not qualified to offer ultimate opinions as to the teratogenicity of sympathomimetics in humans.

12. Dr. Tilelli is a physician who practices in the area of pediatric sub-acute critical care, a field unrelated to teratology, and has no other special training or experience that qualifies him to testify as an expert regarding birth defects or their causes. As with Dr. Done,

259

Dr. Tilelli's review of selected literature—which he reviewed only to enable himself to offer testimony—does not qualify him to offer expert opinions in the area of birth defects and their causes.

13. Dr. Palmer is not a teratologist. Dr. Palmer is a physician whose practice area is internal medicine and clinical pharmacology, fields unrelated to teratology. Dr. Palmer does not have any special training or experience that qualifies him to testify, as an expert, regarding birth defects or their causes. As with Dr. Done and Dr. Tilelli, Dr. Palmer's opinions are based solely upon a review of selected literature. While Dr. Palmer's background as a pharmacologist may qualify him to offer opinions as to the properties or mechanism of action of a drug, it does not qualify him to offer ultimate opinions as to causation in this action.

14. Dr. Gilbert is a pediatric pathologist. While she has performed animal teratological studies, those studies have been limited to in vitro chick embryo experiments that focus on the development of the chick heart. Based upon these studies, Dr. Gilbert is qualified to testify as to hypothetical biologic mechanisms of cardiac teratogenesis. Dr. Gilbert, however, has not demonstrated that she is qualified to render an ultimate opinion as to whether therapeutic doses of Primatene® Tablets or Mist can actually, not hypothetically, cause birth defects in humans.

15. Dr. Newman is a cell biologist and physical chemist who engages in in vitro chick cell experiments to investigate hypothetical biologic mechanisms. Dr. Newman is a bench scientist and does not study or rely upon human data. Dr. Newman did not demonstrate that he is qualified to testify to an ultimate opinion as to whether therapeutic doses of Primatene® Tablets or Mist can actually cause birth defects in humans. Dr. Newman's credentials qualify him to testify regarding plausible biologic mechanisms only.

16. The rabbit study is scientifically flawed. Common sense suggests that the limb/torso ratios of rabbit pups would be dependent in part upon the limb/torso ratios of the pups' parents, a fact confirmed by every witness who was asked the question. Moreover, no dose/response findings were observed in the study. Finally, the asserted protocol, if it existed in writing or otherwise, was not followed as was assumed and asserted in the written report of the study. On the face of the discrepancies disclosed at the Downing hearing, the court finds the rabbit study inadmissible. It was not a study that even the authors could represent was publishable as of the conclusion of the hearing.

260

B. *The Methodologies Employed By Plaintiff's Expert Witnesses*

17. The methodologies employed by plaintiff's expert witnesses do not require statistically significant positive epidemiological data supporting an association between the use of the ingredients of the Primatene® products and limb malformations. Plaintiff's expert witnesses instead rely upon (i) epidemiological data that is at best inconclusive; (ii) anecdotal human data; and (iii) direct extrapolation from Dr. Gilbert's rabbit study and chick embryo studies and direct extrapolation from Dr. Newman's chick cell studies to the human condition. As described below, each of plaintiff's expert witnesses used a methodology not recognized by the relevant scientific community, and not subject to scientific verification. Therefore, each of their opinions was not helpful and must be excluded. See DeLuca, 791 F. Supp. at 1056–58.

18. The "scientific knowledge" requirement of Fed. R. Evid. 702 establishes a standard of "evidentiary reliability"—or "trustworthiness"—that expert opinion evidence must satisfy before admission. Daubert, 113 S. Ct. at 2795 n.9. "Scientific" implies a grounding in the methods and procedures of science. "Knowledge," meanwhile, is more than a witness's subjective belief or unsupported speculation. Daubert, 113 S. Ct. at 2795. Thus, the focus of this court's inquiry must be evidentiary reliability, which is to be based upon a finding of scientific validity. Daubert, 113 S. Ct. at 2795 n.9. See also DeLuca, 791 F. Supp. at 1055.

19. To qualify as "scientific knowledge" and be admissible, expert opinions must be based upon a reliable, scientifically valid methodology. Daubert, 113 S. Ct. at 2795. Expert testimony based upon unreliable methodology is unhelpful and excludable. DeLuca, 791 F. Supp. at 1055 (citations omitted). This court must make an assessment of "whether the *reasoning* or *methodology* underlying the testimony is scientifically valid [evidentiary reliability] and whether that reasoning or methodology properly can be applied to the facts in issue [evidentiary relevance)." Daubert, 113 S. Ct. at 2796.

20. Downing, DeLuca and Daubert have identified several factors to be considered when evaluating the reliability and soundness of a particular methodology:

(i) the novelty of the methodology and its relationship to more established methodologies accepted by the relevant scientific

community, Daubert, 113 S. Ct. at 2797; Downing, 753 F.2d at 1238–39; DeLuca, 791 F. Supp. at 1056;

(ii) the existence of specialized literature, Daubert, 113 S. Ct. at 2797; Downing, 753 F.2d at 1238–39; DeLuca, 791 F. Supp. at 1056;

(iii) the non-judicial uses to which the scientific technique is put, Daubert, 113 S. Ct. at 2797; Downing, 753 F.2d at 1238–39; DeLuca, 791 F. Supp. at 1056–57;

(iv) the frequency with which a technique leads to erroneous results, Daubert, 113 S. Ct. at 2797; Downing, 753 F.2d at 1238–39; DeLuca, 791 F. Supp. at 1056–57; and

(v) the qualifications and professional stature of the expert witnesses employing the methodology, Downing, 753 F.2d at 1238–39; DeLuca, 791 F. Supp. at 1056–57.

(i) *Relationship Of The Methodology To That Accepted By The Community*

■ 21. In evaluating the scientific validity or reliability of a particular methodology, it is appropriate for a trial court to consider whether there is an "explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance [of the espoused scientific method] within that community." Daubert, 113 S. Ct. at 2797.

■■ 22. I conclude that there is a relevant scientific community here—teratologists—and that that community has developed a methodology for investigating and determining whether a particular agent can cause birth malformations in humans. See Daubert, 113 S. Ct. at 2797. That methodology is generally accepted within the community of teratologists, having gained such acceptance through publication and critical review in peer-reviewed journals, other authoritative publications and scientific community interaction. See Daubert, 113 S. Ct. at 2797.

■ 23. Although plaintiff's expert witnesses purport to hail from different disciplines, such as toxicology, pharmacology and pediatric pathology, each is offering an opinion with respect to human birth defects and their causes—i.e., the field of teratology. Accordingly, the methodologies they employ must be compared with the methodology generally accepted by the community of teratologists.

24. Each of plaintiff's expert witnesses is able to draw his or her respective conclusions only by ignoring the basic requirements of the relevant scientific community's methodology. In particular, an essential element of the generally accepted methodology is that exposure during pregnancy should be associated with an increased frequency of a distinctive pattern of birth defects, as shown through repeated, consistent human epidemiological studies. This essential element is absent from the respective methodologies of each of plaintiff's experts.

25. I conclude that the respective methodology of each of plaintiff's expert witnesses is contrary to the generally accepted methodology employed by the relevant scientific community, and that that fact weighs against the admissibility of the opinions of each of plaintiff's expert witnesses.

(ii) *The Existence Of Specialized Literature*

26. In evaluating the scientific validity or reliability of a particular methodology, it is also appropriate for a trial court to consider whether the methodology has been subjected to peer review. Daubert, 113 S. Ct. at 2797. "[S]ubmission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." Daubert, 113 S. Ct. at 2797. If a methodology has not been published in journals for the advancement of science, or if specialized literature has not endorsed a particular methodology, there is no likelihood that the methodology has been exposed to critical scientific scrutiny, which weighs against admissibility. DeLuca, 791 F. Supp. at 1056–57.

27. Unlike the community-accepted methodology, which has gained general acceptance through publication and critical review in peer-reviewed journals and other authoritative publications, there is no evidence that any of the methodologies advanced by plaintiff's experts has been subjected to peer-review among the community of scientists. Indeed, not one of plaintiff's experts has identified any specialized literature endorsing his or her particular methodology. Absent publication in the relevant scientific literature, there is no likelihood that any of these methodologies has been exposed to the type of critical scientific scrutiny that the community's criteria has survived. Downing, 753 F.2d at 1238–39. I conclude that this fact weighs against the admissibility of the opinions of each of plaintiff's expert witnesses.

(iii) *The Non-Judicial Uses To Which The Scientific Methodologies Are Put*

28. In evaluating the scientific validity or reliability of a particular methodology, it is also appropriate for a trial court to consider whether the methodology is used in a non-judicial setting. If a methodology has not been put to any non-judicial use, that weighs against admissibility. DeLuca, 791 F. Supp. at 1056–57; Downing, 753 F.2d at 1239; see also Perry v. United States, 755 F.2d 888, 892 (11th Cir. 1985) ("the examination of a scientific study by a cadre of lawyers is not the same as its examination by others trained in the field of science or medicine").

29. There is no evidence that any of the methodologies employed by plaintiff's expert witnesses has been put to any use outside of the courtroom. Dr. Gilbert, for example, employs the community-accepted criteria when addressing her scientific peers, but has a different methodology when testifying in this matter. Similarly, at such time that Dr. Done made presentations in the field of teratology, he followed the accepted methodology. Drs. Tilelli and Palmer, meanwhile, do not engage in any activities in the field of teratology. Thus, these witnesses do not employ any methodology outside of the courtroom or subject their conclusions to critical peer review. While Dr. Newman does express opinions to his scientific peers in the field of teratology, those opinions relate only to plausible biologic mechanisms; outside of this judicial setting, he has not offered ultimate conclusions regarding the causes of birth defects in humans.

30. None of plaintiff's experts has expressed to the scientific community the opinion that each offers here—that sympathomimetics are teratogenic in humans or, more specifically, that Primatene® Tablets and Mist can cause birth defects in humans at therapeutic dosage. To the extent Dr. Gilbert has expressed any opinion to her scientific peers about the effects in humans of sympathomimetics or Primatene®, she has expressed a mere possibility—that they *may be* teratogenic in humans. In Dr. Done's presentations to the scientific community, he never identified any of the ingredients of Primatene® Tablets or Mist as human teratogens.

31. I conclude that, because the methodologies offered by plaintiff's expert witnesses have not been put to non-judicial use, that

fact weighs against the admissibility of the opinions of plaintiff's expert witnesses.

(iv) *The Qualifications And Professional Stature Of Expert Witnesses*

 32. In evaluating the scientific validity or reliability of a particular methodology, it is appropriate for a trial court to consider the qualifications and stature of the expert witness proposing that methodology. DeLuca, 791 F. Supp. at 1056.

33. As noted, I have concluded that none of plaintiff's expert witnesses is qualified to offer ultimate opinions as to general or specific causation in this case. In particular, Drs. Done, Tilelli, Palmer and Newman do not, as part of their regular activities, study the causes of birth defects in humans and Drs. Done, Tilelli and Palmer have formed their opinions in this case only after reviewing selected literature.

34. In evaluating Dr. Gilbert's and Dr. Tilelli's qualifications and stature, it has been noted that the rabbit study currently is not publishable, neither expert has compared the written reports with the underlying data, and neither is an expert in the characteristics of New Zealand White rabbits. Both Dr. Gilbert and Dr. Tilelli revised manuscripts without inquiring into the validity of any of its findings and continue to do so even though the observed fatal flaws are obviously irreparable. For example, the failure to give the mature male rabbits the prescribed rest periods for sperm regeneration and the failure to measure the body ratios of parent rabbits are material flaws that cannot be rectified by mere editing of the manuscript.

(v) *The Frequency With Which A Technique Leads To Erroneous Results*

 35. In evaluating the scientific validity or reliability of a particular methodology, this court should consider whether the methodology "can be (and has been) tested," and the "known or potential rate of error" in application of the methodology. Daubert, 113 S. Ct. at 2796–2797. The "ultimate touchstone" of the soundness and reliability of a particular methodology or technique "is helpfulness to the trier of fact." DeLuca, 911 F.2d at 956. Helpfulness "turns on whether the expert's 'technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results.'" Id. at 956 (quoting 3 J. Weinstein & M. Berger, Weinstein's

Evidence ¶ 702[03], at 702-35 (1988)). In this regard, "Downing teaches that the frequency with which a scientific technique leads to erroneous results bears heavily on its reliability for evidential purposes." DeLuca, 911 F.2d at 956 n. 19 (citing Downing, 753 F.2d at 1239). "At one extreme, a technique that yields correct results less often than it yields erroneous results is so unreliable that it is bound to be unhelpful to the trier of fact." Downing, 753 F.2d at 1239, cited in Daubert, 113 S. Ct. at 2797 n.12. "Conjectures that are probably wrong are of little use . . . in the project of reaching a quick, final, and binding legal judgment—often of great consequence—about a particular set of events in the past." Daubert, 113 S. Ct. at 2798.

a. *Extrapolation from In Vivo and In Vitro Animal Data*

36. Plaintiff's expert witnesses seek to extrapolate principally from Dr. Gilbert's rabbit study and Dr. Gilbert's chick embryo studies. The notion that one can accurately extrapolate from animal data to humans to prove causation without supportive positive epidemiologic studies is scientifically invalid because it is inconsistent with several universally accepted and tested scientific principles. The principle of species specificity has been tested and demonstrates that different species can react differently to the same agent. Another principle, Karnofsky's Law (i.e., "sledgehammer teratology"), demonstrates that, at some dosage, virtually any substance is teratogenic in an animal species. Finally, the phenomenon that different routes of administration affect the teratogenic impact of an agent has been repeatedly tested and confirmed. Each of plaintiff's expert witnesses has acknowledged the validity of these tested principles.

37. Because of these tested principles, the scientific community does not extrapolate from experimental animal studies to the human experience. There are approximately 2,000 agents that have been shown to be teratogenic in some animal species, but only about 25-30 of those are considered to be human teratogens.

38. I conclude that the theory of plaintiff's expert witnesses that they can directly extrapolate from experimental animal studies without supportive positive human studies to opine as to causation in humans is one that has an extraordinarily high rate of error, see Daubert, 113 S. Ct. at 2797, and this fact weighs against the admissibility of opinions based upon those methodologies.

266

b. *Reliance Upon Anecdotal Human Data*

39. Lacking supportive epidemiological studies for their opinions, Drs. Gilbert, Tilelli and Palmer also claim to draw support from individual human case reports, including Dr. Gilbert's Tedral® case report, Drug Experience Reports ("DERs") and a product liability litigation involving, inter alia, sympathomimetics that are not at issue here. I conclude that such data represent anecdotal information of chance associations, do not purport to assess cause and effect and have no epidemiological significance. See also DeLuca, 791 F. Supp. at 1051; Thomas v. Hoffman-LaRoche, 949 F.2d 806, 815 & n.38 (noting unreliability of DER's), cert. denied, 112 S. Ct. 2304 (1992); Richardson & Richardson v. Richardson-Merrell, Inc., 649 F. Supp. 799, 803 (D.D.C. 1986) (criticizing "the post hoc ergo prooter hoc logic which beckons whenever deformed babies are born to women who have taken any suspect substance"), aff'd, 857 F.2d 823 (D.C. Cir. 1988), cert. denied, 493 U.S. 882 (1989).

40. In DeLuca, the District Court for the District of New Jersey, on remand from the Third Circuit, found that:

> even if . . . DER information were accurately reported, [DERs] have inherent biases as they are second or third hand reports, are affected by medical or mass media attention, and are subject to other distortions.
>
> . . .
>
> . . . DERs are not of a type of data that are reasonably relied upon by experts in the fields of epidemiology and public health to make a determination of the causal relationship between a given substance and human birth defects.

DeLuca, 791 F. Supp. at 1050–51. The District Court then concluded as follows:

> To the extent that Dr. Done used . . . DER data as a basis for his conclusion that Bendectin is a teratogen, the methodology produces inaccurate and unreliable results because such data are unreliable for determining causation.

DeLuca, 791 F. Supp. at 1057. Nothing was presented at the hearing that raises any question regarding the DeLuca court's holdings.

41. Hoffman involved ten DERs reporting seizures following use of Accutane. 949 F.2d at 810. When these reports were analyzed, it was determined that:

> Of the ten reported seizures, three involved patients with a prior history of seizures, three involved patients who were di-

agnosed as having epilepsy unrelated to Accutane, one involved a patient who was eventually diagnosed as having a pre-existing seizure disorder, and two involve patients whose physicians specifically determined that the seizures were not related to Accutane. The tenth report involved a fainting spell, and no cause was determined.

Id. at 815 n.38.

42. I conclude that, by using anecdotal human data as a basis for concluding that Primatene® Tablets and Mist are teratogenic in humans, the methodologies of Drs. Gilbert, Tilelli and Palmer, respectively, are likely to produce inaccurate and unreliable results. I further conclude that this fact weighs strongly against admitting testimony based upon those methodologies.

c. *Conjecture Regarding The Effect of Therapeutic Dosages*

43. The core issue in this case is whether Primatene® Tablets and Mist, *at therapeutic doses,* can cause birth defects in humans consistent with the malformations found in TiaNicole Greaux. Because the methodologies of plaintiff's expert witnesses do not even consider human therapeutic doses, I conclude that those methodologies are so patently unreliable and unlikely to lead to accurate results that they would be unhelpful to a trier of fact.

44. As plaintiff's counsel has acknowledged, none of his expert witnesses "says there is a therapeutic dose relationship." Tr. 11/19/93 (Vol. II) at 72. None of the epidemiologic studies cited shows a statistically significant increase in the risk of malformations associated with therapeutic use of the ingredients of Primatene®. Moreover, of the animal data cited by plaintiff's experts, only Dr. Gilbert's rabbit study attempted to measure the response of an animal to something approaching the equivalent of human dosages. As noted, however, that study did not draw any scientifically valid conclusions, and is inadmissible. The opinions of each of plaintiff's expert witnesses, therefore, is based upon little more than data from in vitro studies in which chick embryos and chick cells were bombarded with abnormal dosages of the ingredients of Primatene®—dosages far in excess of what a pregnant woman would take to treat an attack of asthma.

45. Whatever scientific merit such in vitro chick data may have, they do not show the effect in humans from *therapeutic dosages* of Primatene® Tablets and Mist. While plaintiff's expert witnesses

268

claim to have opinions that therapeutic dosages of those medications are teratogenic in humans, none of those witnesses has provided any reasoned basis to bridge the analytical gap between experimental dosages in chick studies and therapeutic dosages in humans. Because there is no reasoned scientific basis for such an extrapolation, I conclude that the opinions of those witnesses regarding human therapeutic dosages constitute rank speculation and conjecture.

46. Accordingly, I conclude that, because none of the methodologies of plaintiff's expert witnesses considers the question of human therapeutic dosages, those methodologies are likely to produce erroneous results with respect to opinions about the teratogenic potential of the products in humans. I further conclude that this fact weighs heavily against admitting the opinions of plaintiff's expert witnesses.

(vi) *Conclusion*

47. Based upon the foregoing analysis, I conclude that the methodology employed by each of plaintiff's experts, respectively, is scientifically invalid and unreliable. Accordingly, the opinions of each of those experts is deemed unhelpful to a jury and is hereby excluded. See DeLuca, 791 F. Supp. 1056–58.

48. While the opinions of Dr. Gilbert and Dr. Tilelli are subject to all the conclusions reached above, I further conclude that the methodology each employs is nothing more than a prospective risk/benefit analysis that is not helpful to a jury trying to form a judgment about an event that happened in the past. Accordingly, the opinions of Dr. Gilbert and Dr. Tilelli are excluded for this reason as well.

## V. Inadmissibility Under Fed. R. Evid. 703

49. Federal Rule of Evidence 703 provides as follows:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Fed. R. Evid. 703.

50. "Rule 703 and Rule 104(a) require a district court to 'make a factual inquiry . . . as to what data experts in the field find reli-

able.'" DeLuca, 791 F. Supp. at 1058; see Daubert, 113 S. Ct. at 2797–98. "[I]f an expert relies upon facts or data not otherwise admissible and not reasonably relied upon by experts in the relevant field, then the opinion must be excluded." In re: Paoli Railroad Yard PCB Litigation, No. 86–2229, 1992 WL 323493, *22 (E.D. Pa. Oct. 22, 1992) (citing In re Japanese Electronics Prod. Antitrust Lit., 723 F.2d 238, 277 (3d Cir. 1983), rev'd on other grounds sub nom Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)).[1]

51. In arriving at their respective opinions, each of plaintiff's experts relied upon data not reasonably relied upon by teratologists in drawing ultimate conclusions about whether an agent is a human teratogen. Accordingly, each of those opinions must be excluded. See In re: Paoli Railroad Yard PCB Litigation, No. 86-2229, 1992 WL 323493, *22 (E.D. Pa. Oct. 22, 1992).

## A. Epidemiological Data

52. In the aggregate, plaintiff's expert witnesses have cited nine different epidemiological studies as providing some support for their opinions. None of these studies shows a statistically significant increase in the risk of limb malformations associated with the use of any of the ingredients of Primatene® Tablets or Mist. As a result, none of these studies is the type of data upon which the scientific community would reasonably rely to draw a conclusion that the ingredients of Primatene® Tablets or Mist can cause limb defects in humans at therapeutic doses. Because I conclude that Drs. Gilbert, Tilelli, Done and Palmer, in relying upon these studies, have used data that experts in the field would not use in reaching conclusions on the subject, Fed. R. Evid. 703 requires the exclusion of their opinions.

53. Plaintiff observes that an epidemiology or teratology approach to determining causation for TiaNicole's condition would be so costly that it would never be undertaken, given the rarity of her pattern of malformations. She further complains that an epidemiological approach seeks to obtain "conclusive" evidence of causation before it declares that a biological association actually exists, ignoring in the process individual or isolated adverse impacts. All agree that human data is the only, or best, data source for

---

[1] If expert testimony is admissible under Rule 703, it may still be excluded as unreliable under Rule 702. In re Paoli, 919 F.2d at 854 n.29.

determining biological association. Both parties acknowledge that human experimentation is immoral and unethical. Therefore, it follows that only an epidemiological approach provides reasonably conclusive data about associations likely to occur in humans.

## B. Anecdotal Human Data

54. As discussed above, anecdotal human data, whether from published case reports, DERs or other litigation, have inherent biases that make them unreliable. As a result, such anecdotal human data do not represent the type of data reasonably relied upon by experts in the field of teratology to draw conclusions regarding whether the agent discussed in the case report is a human teratogen and, accordingly, any reference thereto is inadmissible. See also DeLuca, 791 F. Supp. at 1059. Because I conclude that Drs. Gilbert, Tilelli and Palmer, in relying upon such anecdotal human data, have used data that experts in the field of teratology would not use in reaching conclusions on the subject, Fed. R. Evid. 703 requires the exclusion of their opinions.

## C. In Vivo and In Vitro Animal Data

55. In vivo and in vitro animal test data are unreliable predictors of causation in humans. See Agent Orange, 611 F. Supp. at 1241 ("animal studies are not helpful . . . because they involve different biological species. They are of so little probative force and are so potentially misleading as to be inadmissible"); see also Black, A Unified Theory of Scientific Evidence, 56 Fordham L. Rev. 595, 678 n.513 (1988) (attempts to extrapolate low dosage predictions in humans from high dosage animal data are scientifically unsound and should not be permitted in a court of law). Plaintiff's expert witness Alan K. Done, M.D., for example, has admitted in other litigation that, "because so many substances are teratogenic in animals, before you can make a conclusion that a substance is teratogenic in humans, you must look to the human data." Richardson & Richardson v. Richardson-Merrell. Inc., 857 F.2d 823, 830–31 (D.C. Cir. 1988), cert. denied, 493 U.S. 882 (1989). Indeed, the District Court in DeLuca held that animal studies were inadmissible in and of themselves and were incapable of serving as a foundation for Dr. Done's testimony in that case. DeLuca, 911 F.2d at 946 n.8.

56. In vivo animal studies are unreliable predictors of results in humans for several reasons, including the facts that (a) many test

271

animals are bred to be sensitive to a particular type of response; (b) there are differences between the dosages given to experimental animals and those taken by humans for therapeutic purposes and (c) animals have dramatically different physiology, biochemistry and metabolism pathways that break down the toxic chemicals so that, from species to species, there are differences in bioactivation and detoxification. In re Paoli Railroad Yard PCB Litigation, No. 86-2229, 1992 WL 323633, *5 (E.D. Pa. Oct. 21, 1992). In vitro test data is subject to the same deficiencies, but is even further removed from the human experience because the exposures do not replicate the human exposures.

57. While in vitro and in vivo animal studies can be helpful in determining human teratogenicity either by providing information regarding possible biologic mechanisms or by showing a dose/response relationship, I conclude that in vivo and in vitro animal test data are not relied upon by experts in the field of teratology for extrapolating the results found directly to the human experience.

58. In particular, based upon the detailed findings above, I conclude that Dr. Gilbert's rabbit study is not the type that produced scientifically valid data upon which a scientist in this field could reasonably rely to draw conclusions as to the teratogenicity of Primatene® Tablets or Mist in rabbits, let alone in humans at therapeutic doses. This study has no evidentiary value, is inadmissible and is hereby excluded.

59. Similarly, while Dr. Gilbert's chick embryo studies may serve some scientific purpose, such as to further an understanding regarding biologic mechanisms, experts in the field of teratology, in the absence of positive human epidemiologic data, do not reasonably rely upon such studies to reach conclusions as to whether the agent studied is teratogenic in humans at therapeutic doses. Accordingly, these studies are inadmissible for the purpose of extrapolating the results found to reach such a conclusion.

60. I conclude that Drs. Gilbert, Tilelli, Done, Newman and Palmer have relied upon in vitro and in vivo animal data to extrapolate directly the results to humans, and, in particular, have relied upon either Dr. Gilbert's rabbit study, chick studies or both. Accordingly, I conclude that each of those expert witnesses has relied upon data that experts in the field of teratology would not reasonably rely upon, in the absence of positive human epidemiologic data, to opine as to whether an agent is teratogenic in humans, and

272

that Fed. R. Evid. 703 requires the exclusion of their respective opinions.

## VI. The Possibility That Admitting the Evidence Would Overwhelm, Confuse, or Mislead the Jury

61. Federal Rule of Evidence 403 provides as follows:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403.

62. Even if this court did not conclude that the opinions of plaintiff's experts were based upon unreliable methodologies or data, those opinions should still be excluded if a jury will give them more than their probative value because of their purported scientific origins. DeLuca, 791 F. Supp. at 1057–58. In making that determination, this court must keep in mind "the extent to which probative scientific evidence is capable of being properly utilized by the jury." DeLuca, 911 F.2d at 957. Specifically, will the jury be able to give appropriate weight to the testimony of plaintiff's expert witnesses, or will the evidence, because of its scientific origins, take on an importance beyond its probative value? Id. Downing specifically provides that Fed. R. Evid. 403 is an independent hurdle to the admissibility of expert witness testimony. See, e.g., Paoli, 232493 WL at *23.

63. The core issue in this case is whether Primatene® Tablets and Mist, *at therapeutic doses*, can cause birth defects in humans consistent with the malformations found in TiaNicole Greaux. Accordingly, I conclude that for expert opinions on human causation to be sensible to the jury, those opinions must consider human therapeutic dosages.

64. As noted, the methodologies of plaintiff's expert witnesses ignore the question of therapeutic dosage. I conclude that, in light of that fact, opinions from those witnesses that therapeutic dosages of Primatene® Tablets and Mist are teratogenic would confuse, mislead and overwhelm the jury, and that Fed. R. Evid. 403 warrants the exclusion of those opinions independent of Fed. R. Evid. 702 and 703.

65. Plaintiff recognizes the general proposition that one cannot extrapolate directly from mammal and chick studies to the human condition but offers that if such studies are the best that exist, a jury nevertheless should be permitted to decide, from data not subject to extrapolation, what scientists admit they cannot prove to be biological associations in humans. Any extrapolation that is based upon speculation or speculative data can produce only a speculative, and therefore inadmissible, opinion.

## VII. The Insufficiency Of Plaintiff's Expert Opinion Evidence To Support A Jury Verdict

66. Even when a court determines that expert opinion evidence is admissible, it must still determine whether it would be sufficient to sustain a jury verdict in plaintiff's favor. DeLuca, 911 F.2d at 958. "[I]n the event the trial court concludes that the scintilla of evidence presented supporting a proposition is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment, and likewise to grant summary judgment." Daubert, 113 S. Ct. at 2798. See Elkins v. Richardson-Merrell, Inc., No. 92-6172, 1993 WL 413981 (6th Cir. October 20, 1993).

67. As noted, plaintiff must prove not only that Primatene® Tablets or Mist can cause limb defects in humans in therapeutic doses (general causation), but also that they did so in this case (specific causation). See DeLuca, 911 F.2d at 958. To prove specific causation, plaintiff must *first* prove that the products at issue can cause limb reduction malformations in humans and must *then* exclude other possible causes for the plaintiff's injury. See Agent Orange, 611 F. Supp. at 1250.[2]

68. Plaintiff's expert opinion evidence regarding general causation is insufficient. One of plaintiff's own expert witnesses, Dr. Done, has admitted that, after conducting what he considered a scientifically valid investigation, he concluded that it is "not yet entirely clear" whether the ingredients of Primatene® Tablets or Mist are teratogenic in humans in therapeutic doses.

69. Regarding specific causation, each of plaintiff's expert witnesses who addressed that topic asserted that he or she had ex-

---

[2] In addition, when an expert witness does not exclude potential alternative causes, the potential for confusion among jurors is "evident" and is an independent basis for exclusion. DeLuca, 791 F. Supp. at 1058.

274

cluded other possible causes. Despite their conclusory assertions, I conclude, based upon the testimony, that those witnesses either have not excluded or cannot exclude as a cause of TiaNicole Greaux's defects (i) genetic defects, (ii) endogenous epinephrine, (iii) plaintiff's prior abortions, (iv) plaintiff's asthma, (v) the use of Isuprel® or (vi) those unknown events that cause the great majority of birth defects. Because plaintiff's expert witnesses cannot exclude other possible causes, I conclude that plaintiff cannot prove specific causation.

70. Consequently, I conclude that plaintiff has not produced evidence sufficient to sustain a jury verdict in her favor with respect to either general or specific causation.

### VIII. The Propriety of Granting Summary Judgment In Favor Of Defendant

71. Summary judgment is proper where a party fails to establish the existence of an element essential to his case on which he bears the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Because this court has concluded that the opinions of each of plaintiff's expert witnesses are inadmissible under Fed. R. Evid. 702, 703 and 403, and are, in any event, insufficient to sustain a jury verdict in plaintiff's favor, I am constrained to conclude that plaintiff has not met her burden under Celotex to produce evidence sufficient to raise a genuine issue of material fact as to whether TiaNicole Greaux's birth defects were caused by maternal ingestion of Primatene® Tablets or Mist during pregnancy. Id.; Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). Accordingly, summary judgment is entered in favor of defendant Whitehall.

For the foregoing reasons,

It is on this 1st day of March, 1994,

ORDERED that defendant Whitehall's motion for summary judgment be and is hereby GRANTED.